(No. 83127

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. NIELS NIELSON, Appellant.

*Opinion filed June 17, 1999.—Rehearing denied October 4, 1999.*

272

HARRISON, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Kevin C. Kakac, State's Attorney, of Fairfield (William L.

Browers and Steven J. Zick, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE RATHJE delivered the opinion of the court:
Defendant, Niels Nielson, was charged by indictment with six counts of first degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 1996)) and two counts of concealing a homicidal death (720 ILCS 5/9—3.1(a) (West 1996)). A jury convicted defendant of two of the first degree murder counts and both concealment counts. The same jury sentenced defendant to death, and the circuit court of Wayne County imposed two extended 10-year prison terms for the concealment convictions. Defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a).

On appeal, defendant argues that (1) the trial court erred in denying his motions to suppress evidence and to suppress statements; (2) the trial court erred in holding the capital sentencing hearing in defendant's absence; (3) the trial court erred in admitting irrelevant and prejudicial evidence during the second phase of defendant's capital sentencing hearing; (4) the State made improper arguments during the second phase of defendant's capital sentencing hearing; (5) one of the capital sentencing jury instructions is confusing; (6) the trial court erred in imposing extended-term prison sentences for the concealment convictions; and (7) the Illinois death penalty statute is unconstitutional. We will address each of these arguments, and the facts relating to them, in turn.

## BACKGROUND
Because defendant does not challenge the sufficiency of the evidence, we need not set forth a detailed account of the facts.

Defendant was convicted of murdering his ex-wife, Sue Marshel, and her daughter, Melinda Marshel. Sue

and Melinda disappeared on July 4, 1995. The next evening, in a pond in Wayne County, Sue's car was found partially submerged with a furring strip wedged between the driver's seat and the accelerator. On July 8, 1995, approximately three-quarters of a mile from where the car was found, the police discovered a duffle bag containing the charred remains of two persons, one of whom had died from at least two gunshot wounds to the head and one of whom had died from at least three gunshot wounds to the head. A .32-caliber bullet was found in one of the charred bodies, and a .32-caliber casing was found in the duffle bag. Dental records confirmed that the charred remains were those of Sue and Melinda Marshel.

While searching the trailer in which defendant lived with his mother and stepfather, Joyce and George Lathrop, the police found the gun that fired the bullet found in the body. Outside the trailer, the police found a furring strip matching the one that was wedged against the accelerator of Sue's submerged car. In a burn pile located approximately 150 feet from the trailer, the police found human hair, blood, and bone fragments, as well as personal property belonging to Sue and Melinda Marshel.

In interviews with the police, defendant initially denied any knowledge of Sue and Melinda's whereabouts. After the bodies were found, defendant admitted to helping conceal the murders and burn the bodies but denied any participation in the actual murders.

The trial court denied defendant's motions to suppress the evidence found in the burn pile and the statements given to the police. Following a jury trial, defendant was convicted of both murders and sentenced to death.

## MOTION TO SUPPRESS EVIDENCE

Defendant first argues that the trial court erred in denying his motion to suppress the evidence discovered in the burn pile.

## Background

Defendant moved "to suppress the fruits of any search or seizure from an alleged burn pile located approximately 150 feet North of the residence of George Lathrup [sic], or any outbuildings, land outside the house of George Lathrup [sic]." In the motion, defendant alleged that, on July 6, 1995, the police arrived at George Lathrop's trailer, located at RR 1, Box 170, in Wayne County. The police asked George to sign a consent to search form authorizing a search of the "House," and George agreed. After completing the search of the house, and without obtaining George's consent, the police began searching the property surrounding the house, "including an area that was 150 feet or more from the house, itself, designated as a burn pile or burn barrel." Although the police identified certain items of interest in the burn pile, they did not seize those items. Instead, they left George's property and returned two days later with a warrant to search the burn pile. Defendant asked the trial court to suppress the evidence seized from the burn pile, arguing that (1) the initial search of the burn pile exceeded the scope of George's written consent, and (2) the subsequent warrant was issued on the basis of information obtained during the initial unauthorized search.

At the hearing on defendant's motion, defendant's mother, Joyce Lathrop, testified that the family's trailer sat on approximately 20 acres of land. The Lathrops maintain three or four acres immediately surrounding the trailer for residential purposes and lease the remainder to the Neffs, a family of sharecroppers, for cultivation. "Cattle fencing," brush, and trees line the northern boundary of the Lathrops' property. The burn pile sits along this boundary line, approximately 150 to 175 feet from the trailer, and is surrounded by an overgrowth of tall weeds. Joyce described the area surrounding the burn pile as "really a mess this year." The burn pile is visible from both a dirt lane used by the Neffs to gain access to

the Lathrops' farm fields and the northern boundary line, where Joyce has seen hunters walking "several times." The Lathrops do not post a "No Trespassing" sign on their property and require neither the Neffs nor the hunters to obtain permission before entering their property.

George Lathrop testified that the burn pile sits "at least" 120 feet from the trailer. When asked why he did not place the burn pile closer to the trailer, George responded that the burn pile is both a fire hazard and a sanitation problem.

Hazel Neff testified that she, her husband, and her son farm the Lathrops' land. The Neffs access the Lathrops' farmland via a dirt lane that runs along the southern boundary of the Lathrops' yard, and they are free to "just come and go as [they] please."

Merril Neff testified that he and his family do not have to ask permission to enter the Lathrops' property, but instead may go there when they need to, "no problem." Merril testified that, on the afternoon of July 6, 1995, he was riding his tractor in the Lathrops' field when he noticed a garbage fire burning in the vicinity of the Lathrops' burn pile.

Terry Neff testified that, on the afternoon of July 6, 1995, he was traveling to the Lathrops' property to help his father with the farming. Approximately 100 yards from the Lathrops' property, he noticed smoke rising from the vicinity of the Lathrops' burn pile. The smoke was "bigger than a trash fire smoke," "dark black," and rising in a column "four or five foot [sic] across."

Donald Atwood, Jr., a Wayne County sheriff's deputy, testified that, on July 9, 1995, he and another deputy flew over the Lathrops' property in a helicopter at an altitude of 100 feet. The Lathrops' burn pile clearly was visible as such from the air, and Deputy Atwood estimated that the burn pile sat 175 feet from the Lathrops' trailer.

In addition to the testimony described above, both defendant and the State elicited testimony and called witnesses in relation to the police officers' conduct during the July 6, 1995, search of the Lathrops' property, George Lathrop's participation in that search, and the scope of George Lathrop's consent to search.

At the close of the testimony, defendant argued that the police exceeded the scope of George Lathrop's written consent by searching outside the house, that the burn pile sits within the trailer's curtilage, and that defendant, who had been living with the Lathrops for several months, had standing to challenge the validity of the search. In response, the State argued that the burn pile sits outside the trailer's curtilage and therefore was not protected by the fourth amendment and that defendant lacked standing to challenge the search because he had no reasonable expectation of privacy in the burn pile's existence. In addition, the State argued that George Lathrop implicitly consented to the search of the burn pile.

In a written order, the trial court denied defendant's motion to suppress on the ground that George Lathrop had consented orally to the search of the burn pile.

Analysis

On appeal, defendant contends that the trial court erred in concluding that George Lathrop consented to a search of the Lathrops' burn pile. We need not evaluate the scope of George Lathrop's consent, however, because we agree with the State that the Lathrops' burn pile undoubtedly sits outside the trailer's curtilage.

As an initial matter, defendant argues that the State has defaulted the curtilage argument because, although the State raised the argument in its written response to defendant's motion, called witnesses and elicited testimony in support of the argument at the evidentiary hearing, and devoted almost its entire closing to the argument, it failed to request a specific ruling on the

argument after the trial court denied defendant's motion on another basis. Defendant's argument is wholly without merit, as it is well settled that the appellee may raise any argument that supports the trial court's judgment, even if the argument was not directly ruled upon by the trial court. *People v. Monroe*, 118 Ill. 2d 298, 300 (1987).

We now turn to the merits. The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; see also *Elkins v. United States*, 364 U.S. 206, 213, 4 L. Ed. 2d 1669, 1675, 80 S. Ct. 1437, 1442 (1960) (fourth amendment is applicable to state officials through the fourteenth amendment). Similarly, article I, section 6, of the Illinois Constitution of 1970 provides that the "people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures." Ill. Const. 1970, art. I, § 6. Here, defendant explicitly invokes only the fourth amendment in support of his position, and he in no way suggests that the Illinois Constitution offers him greater protection. We therefore confine our analysis to fourth amendment jurisprudence.

The fourth amendment's protection against unreasonable searches and seizures extends not only to a person's home but also to the area immediately adjacent to the home, commonly referred to as the curtilage. *Oliver v. United States*, 466 U.S. 170, 180, 80 L. Ed. 2d 214, 225, 104 S. Ct. 1735, 1742 (1984). Conversely, no reasonable expectation of privacy attaches to the land sitting outside of the home's curtilage, commonly referred to as "open fields." *Oliver*, 466 U.S. at 180, 80 L. Ed. 2d at 225, 104 S. Ct. at 1742. Thus, unlike the home's curtilage, open fields are *not* protected by the fourth amendment against unreasonable searches and seizures. *Oliver*, 466 U.S. at 180-81, 80 L. Ed. 2d at 225-26, 104 S. Ct. at 1742.

In determining whether a particular area falls within a home's curtilage, we must ask whether the area harbors the intimate activities commonly associated with the sanctity of a man's home and the privacies of life. *United States v. Dunn*, 480 U.S. 294, 300, 94 L. Ed. 2d 326, 334, 107 S. Ct. 1134, 1139 (1987). The extent of the curtilage is determined by factors "that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Dunn*, 480 U.S. at 300, 94 L. Ed. 2d at 334, 107 S. Ct. at 1139. These factors include (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *Dunn*, 480 U.S. at 301, 94 L. Ed. 2d at 334-35, 107 S. Ct. at 1139. Applying these factors to the Lathrops' burn pile, we have little difficulty in concluding that the burn pile sits outside the trailer's curtilage and therefore is not protected against unreasonable searches and seizures.

*First.* Three witnesses estimated the distance between the Lathrops' trailer and the burn pile. Joyce Lathrop estimated the distance as between 150 and 175 feet, George Lathrop estimated the distance as "at least" 120 feet, and Deputy Atwood estimated the distance as 175 feet. In addition, in his motion to suppress, defendant himself asserts that the burn pile sits "150 feet or more from the house." Standing in isolation, this substantial distance supports no inference that the burn pile should be treated as an adjunct of the trailer. See *Dunn*, 480 U.S. at 302, 94 L. Ed. 2d at 335, 107 S. Ct. at 1140 (holding that distance of 150 to 180 feet supports no such inference).

*Second.* The burn pile does not lie within an enclosure that surrounds the house. Aerial photographs introduced

during the suppression hearing demonstrate that nothing encloses the area that includes both the trailer and the burn pile. To be sure, cattle fencing, intermittent trees, and brush mark the northern boundary of the Lathrops' property in the vicinity of the burn pile, but there is nothing in the record to suggest that they also constitute the boundary of the trailer's curtilage. Indeed, this could not be the case, as the fencing, trees, and brush form a solitary straight line, not an enclosure surrounding the burn pile and trailer.

*Third.* The burn pile is not used for "the intimate activities of the home" such that it "should be treated as the home itself." On the contrary, it is used for burning garbage. Significantly, George Lathrop testified that he deliberately keeps the burn pile a long distance from the trailer because it constitutes both a fire hazard and a sanitation problem. A fire hazard and sanitation problem that is intentionally placed away from the family's living space hardly comports with a conception of "the home itself." Moreover, while the Lathrops meticulously maintained the area of their yard that they used for picnicking and sitting outside, Joyce testified that the area surrounding the burn pile was not maintained at all and in fact was "really a mess." Given the care with which the Lathrops maintained the outdoor areas undoubtedly used as living spaces, the neglect of the area surrounding the burn pile further supports the conclusion that the Lathrops did not consider the burn pile as an extension of the house itself.

*Fourth.* The Lathrops took no steps whatsoever to protect the burn pile from observation by people passing by. The Lathrops did nothing to dissuade both friends and strangers from entering onto their property. Indeed, Joyce testified not only that the Neffs enjoyed unlimited access to the Lathrops' property, but also that local hunters were welcome to traverse the Lathrops' northern

fence line and in fact had done so "several times." The Neffs confirmed Joyce's account, explaining that they need not ask permission to cross the Lathrops' property but instead "just come and go as [they] please." Significantly, the burn pile is visible from both the dirt lane used by the Neffs and the fence line traversed by the hunters. Defendant contends that the overgrowth of weeds surrounding the burn pile represents an effort by the Lathrops to conceal the burn pile from people passing by. Nothing in the record supports this argument, however, as the Lathrops testified that the weeds are the result of neglect, not a desire for privacy. More importantly, the weeds *do not* conceal the burn pile from people passing by. The record establishes that the burn pile is visible from both the fence line traversed by hunters and the dirt lane used by the Neffs.

In sum, the burn pile constitutes both a fire hazard and a sanitation problem, and the Lathrops deliberately placed it a substantial distance from the trailer. There is nothing that encloses both it and the trailer, and the Lathrops have taken no steps to shield the burn pile from known passers-by. The burn pile fails every test for determining whether an area constitutes curtilage. We therefore hold that the burn pile lies outside the trailer's curtilage and is protected by neither the United States Constitution nor the Illinois Constitution against unreasonable searches and seizures. Defendant's motion to suppress was properly denied.

## MOTION TO SUPPRESS STATEMENTS

Defendant next argues that the trial court erred in denying his motion to suppress statements. In that motion, defendant sought to suppress statements that he gave to the police on July 6, July 8, July 9, and July 10, 1995. Although the trial court denied the motion in its entirety, the State introduced only the July 10, 1995, statement at trial. Consequently, defendant confines his

argument, and we confine our analysis, to the admissibility of defendant's July 10, 1995, statement.

Background

The essential facts relating to defendant's July 10, 1995, statement are not in dispute. On July 10, 1995, defendant was being held at the Wayne County jail following his arrest for theft and firearms offenses. At approximately 1 p.m., Special Agent Richard Kamminga and Officer Larry Blaize, both of the Illinois State Police, asked a jail officer to inform defendant that they would like to speak with him. When defendant arrived at the interview room, Officer Blaize read defendant his *Miranda* warnings. Although defendant stated that he understood his rights and was willing to talk, he refused to sign a waiver of rights form. Agent Kamminga began the interview by telling defendant that the investigation into the Marshels' murders was continuing and that the police now knew that bodies had been burned at defendant's residence. Defendant became increasingly agitated, until finally he placed his hands over his ears, looked up at the ceiling, and began repeating, "nah nah nah nah nah." Defendant then stood up and announced that he was leaving. Officer Blaize told defendant to sit back down, as he did not want defendant exiting without an escort. Realizing the interview's utility was exhausted, Officer Blaize and Agent Kamminga returned defendant to his cell. The entire interview lasted approximately 15 minutes.

Between 1:30 and 2 p.m., Deputy Blake Adams of the Wayne County sheriff's office noticed that defendant was sitting in the jail's exercise yard. Deputy Adams offered defendant a cup of coffee, and defendant accepted. When Deputy Adams delivered the cup of coffee, defendant asked him whether he was "the deputy from Wayne City." Deputy Adams responded that he was, and a conversation ensued. Over the course of the next hour,

Deputy Adams and defendant talked about such things as Deputy Adams' new house in Wayne City, Deputy Adams' recent vacation to Montana, Deputy Adams' family, and Deputy Adams' new boat. Noticing a tattoo on defendant's leg, Deputy Adams decided to ask defendant about it. Before doing so, however, he read defendant his *Miranda* warnings "in case he did say anything." When defendant stated that he understood his rights, Deputy Adams asked defendant whether he wished to continue the conversation. Defendant stated that he did.

The conversation turned briefly to defendant's tattoo, which defendant obtained while in a Utah prison. Defendant then asked Deputy Adams whether he knew what was going to happen to defendant. Deputy Adams stated that he did not because, although he had been present when the Marshels' bodies were found, he was only marginally involved with the investigation. Defendant asked whether Deputy Adams had known Sue and Melinda Marshel, and Deputy Adams responded that he had met them both briefly. After beginning to cry, defendant stated, "They're going to make me out to be a Dahlmer [*sic*]." Defendant then confessed to concealing Sue's car and carrying the bodies to the burn pile, but he denied any participation in the actual murders. Deputy Adams asked defendant why he had not told this to the police, and defendant explained that he was afraid of the actual murderer.

Wanting someone else to hear what he had to say, defendant asked to speak with Officer Blaize. Deputy Adams accompanied defendant inside the jail and informed Officer Blaize that defendant wished to make a statement. At 3:24 p.m., Officer Blaize began his conversation with defendant by once again reading him his *Miranda* warnings. After stating that he understood his rights, defendant signed a waiver of rights form and agreed to talk with Officer Blaize. Over the next hour, defendant gave the statement that was admitted into evidence at trial.

Defendant moved to suppress his July 10, 1995, statement to Officer Blaize. In his motion, defendant argued that (1) he had invoked his right to remain silent during the 1 p.m. interview with Officer Blaize and Agent Kamminga, and (2) Officer Blaize and Deputy Adams violated defendant's right to remain silent by again questioning him so soon after the 1 p.m. interview concluded. The trial court denied defendant's motion, holding that enough time elapsed between the 1 p.m. interview and the subsequent interrogation that produced the challenged statement.

## Analysis

As a general rule, this court will reverse a trial court's denial of a motion to suppress statements only if that ruling is manifestly erroneous. *People v. Williams*, 181 Ill. 2d 297, 309 (1998). In this case, however, *de novo* review is appropriate, as neither the facts nor the credibility of the witnesses is at issue. *Williams*, 181 Ill. 2d at 309.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the Supreme Court declared that if during a custodial interrogation an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. *** [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 473-74, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28.

However, in *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975), the Supreme Court clarified that *Miranda* did not create a *per se* proscription against any further questioning by any police officer, on any topic, once the suspect invokes his right to remain silent. *Mosley*, 423 U.S. at 102-03, 46 L. Ed. 2d at 320-21, 96 S. Ct. at 326. Rather, the Court concluded that the

admissibility of statements obtained after the defendant decides to remain silent depends upon on whether the defendant's " 'right to cut off questioning' " was " 'scrupulously honored.' " *Mosley*, 423 U.S. at 104, 46 L. Ed. 2d at 321, 96 S. Ct. at 326. In deciding this question, courts should consider whether (1) the police immediately halted the initial interrogation after the defendant invoked his right to remain silent; (2) a significant amount of time elapsed between the interrogations; (3) a fresh set of *Miranda* warnings were given prior to the second interrogation; and (4) the second interrogation addressed a crime that was not the subject of the first interrogation. *Mosley*, 423 U.S. at 104-05, 46 L. Ed. 2d at 321-22, 96 S. Ct. at 327. The fact that the second interrogation addressed the same crime as the first interrogation does not preclude a finding that the defendant's right to remain silent was scrupulously honored. *People v. Foster*, 119 Ill. 2d 69, 86-87 (1987).

In this case, there is no question that defendant invoked his right to remain silent during the 1 p.m. interview with Officer Blaize and Agent Kamminga. By placing his hands over his ears, turning his head to the ceiling, and chanting "nah nah nah," defendant clearly "indicate[d] his desire to cut off questioning." See *People v. Smith*, 152 Ill. 2d 229, 255 (1992). Our conclusion is bolstered by the fact that both Officer Blaize and Agent Kamminga interpreted defendant's conduct as an expression of his desire to terminate the interview. More importantly, defendant's conduct *did* in fact terminate the interview, as Officer Blaize and Agent Kamminga returned defendant to his cell immediately following the "nah nah nah" episode.

The question thus becomes whether the police scrupulously honored defendant's right to remain silent. Before we can answer this question, however, we first must determine when defendant's second interrogation

commenced. Defendant argues that the second interrogation commenced between 1:30 and 2 p.m., when Deputy Adams first approached defendant in the exercise yard. The State disagrees, arguing that the second interrogation did not commence until Officer Blaize initiated his second conversation with defendant. We agree with the State.

In *Rhode Island v. Innis*, 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980), the Supreme Court offered the following guidelines for determining when an interrogation begins for purposes of *Miranda*:

> "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response."
> *Innis*, 446 U.S. at 300-02, 64 L. Ed. 2d at 307-08, 100 S. Ct. at 1689-90.

Under *Innis*, Deputy Adams' conversation with defendant in the exercise yard was not an "interrogation." Deputy Adams and defendant spent the first hour of that conversation discussing such things as Deputy Adams'

new house, Deputy Adams' recent vacation, Deputy Adams' family, and Deputy Adams' new boat. Absent a refined sense of clairvoyance, Deputy Adams simply had no reason to anticipate that these topics "were reasonably likely to elicit an incriminating response" from defendant. The same holds true for Deputy Adams' questions relating to defendant's tattoo. To be sure, Deputy Adams administered *Miranda* warnings prior to inquiring about the tattoo, but we know of nothing in human experience to suggest that questioning the origins of a man's tattoo is "likely to elicit an incriminating response" from a homicide suspect. Deputy Adams' brief comments concerning his role in the investigation and his relationship with the victims undoubtedly related to defendant's crime, but they in no way constituted "coercive police practices" from which defendant required an "added measure of protection." Indeed, defendant himself turned the conversation toward the investigation, and Deputy Adams confined his remarks to answering defendant's questions. See *People v. Dalton*, 91 Ill. 2d 22, 31 (1982) (defendant's statement was voluntary where he initiated the conversation about the crime). Significantly, although defendant insists that the conversation in the exercise yard was an interrogation, he identifies nothing from that conversation that was "likely to elicit an incriminating response" from him.

We therefore hold that defendant's second interrogation began no earlier than 3:24 p.m., when Officer Blaize initiated the interview that produced the challenged statement. Given this fact, we have no problem concluding that defendant's right to remain silent was scrupulously honored. First, Officer Blaize and Agent Kamminga halted the 1 p.m. interrogation immediately after defendant invoked his right to remain silent. Second, the 1 p.m. interview terminated at no later than 1:15 p.m., more than two hours before Officer Blaize's subsequent

interrogation of defendant. Thus, a significant amount of time elapsed between the interrogations. See *Mosley*, 423 U.S. at 104-06, 46 L. Ed. 2d at 322, 96 S. Ct. at 326 (a separation of "more than two hours" constitutes "the passage of a significant period of time"). Third, defendant received two sets of fresh *Miranda* warnings in the moments preceding the second interrogation: one from Deputy Adams in the exercise yard and another from Officer Blaize in the interview room. Finally, although the second interrogation addressed the same crime as the first interrogation, this alone does not preclude a finding that the defendant's right to remain silent was scrupulously honored. See *Foster*, 119 Ill. 2d at 86-87.

The record demonstrates that defendant's right to remain silent was scrupulously honored. The trial court therefore properly denied defendant's motion to suppress the July 10, 1995, statement to Officer Blaize.

## CAPITAL SENTENCING HEARING: DEFENDANT'S ABSENCE

Defendant next argues that the trial court erred in holding the capital sentencing hearing in defendant's absence.

### Background

The first day of defendant's capital sentencing hearing opened with the following colloquy:

"THE COURT: Be seated, please. Show we're in open court without the jury being present. The defendant is here with his counsel. The State's Attorney is here.

DEFENDANT: Yeah, why the fuck am I here?

THE COURT: The Attorney General is here.

DEFENDANT: You stupid fuckin' piece of shit.

THE COURT: Mr. Nielson, I understand you're upset about the verdict yesterday and I understand why you would be.

DEFENDANT: Well, imagine that, you stupid motherfucker.

THE COURT: I think you're overreacting to the circumstances.

DEFENDANT: Well, fuck you.

THE COURT: What did you say?

DEFENDANT: Fuck you.

THE COURT: Okay. It's my job to explain certain things to you.

DEFENDANT: I don't give a shit."

The conversation continued in this vein for six pages of the report of proceedings, during the course of which defendant referred to the trial court as a "dumb ass," a "dumb fucker," a "motherfucker," a "dumb motherfucker," a "stupid motherfucker," and an "asshole." In response to the trial court's warning that defendant's belligerence would not evoke sympathy from the jury, defendant promised, "I'm going to act up. I'll guarantee you." The trial court then threatened defendant with contempt of court, to which defendant responded, "Oh, no! I can go to jail? I've been in jail now for 10 months, you stupid motherfucker." Sensing that this was an appropriate time for a break, the trial court ordered a brief recess to allow defendant to confer with his attorneys. Defendant responded, "I'll come back and tell you off again, you stupid fucker."

When the proceedings reconvened, defense counsel informed the trial court that defendant "does not wish to participate in any proceedings and is willing to waive on the record his right to be present." Defense counsel explained that defendant's continued presence in the courtroom would be "detrimental to his interests as the law perceives them."

The trial court then admonished defendant of his rights, explaining that defendant had the absolute right to be present and to participate throughout the proceedings. The trial court reminded defendant of the sentencing hearing's purpose, and informed defendant of his right to subpoena witnesses, to confront and cross-examine the State's witnesses, and to testify. If he remained in the courtroom, defendant would be able to

confer with his counsel and make suggestions on how best to proceed. By removing himself from the courtroom, defendant would be giving up all of these rights, and would be denying the jury the opportunity to observe him during the hearing. The trial court insisted that, although it did not want defendant to be absent from the hearing, it would have no choice but to remove defendant from the courtroom if defendant continued to be disruptive.

Following the trial court's admonitions, another colloquy occurred:

"THE COURT: Mr. Nielson, can you behave yourself at this point?

DEFENDANT: Hell no.

THE COURT: What?

DEFENDANT: Hell no.

THE COURT: I couldn't hear what you said.

DEFENDANT: Hell no!

THE COURT: Okay. Are you going to act out when I bring the jury in?

DEFENDANT: Yeah.

THE COURT: What are you going to do?

DEFENDANT: Call them names.

THE COURT: Okay.

DEFENDANT: Everything you don't want me to do."

At this point, defense counsel again explained that defendant wished to waive his right to be present. After confirming that defendant fully understood his rights, had conferred with counsel, and was acting freely and voluntarily, the trial court accepted defendant's waiver. The trial court told defendant that he was free to return to the courtroom at anytime, "all you have to do is tell me you're going to change your mind and we'll let you back in without any penalties at all." Defendant was then removed from the courtroom.

Similar events transpired each morning of defendant's sentencing hearing, as the trial court administered fresh admonitions and asked defendant whether he

wished to return to the courtroom. In each instance, defendant elected to stand by his waiver, vowing to disrupt the proceedings if kept in the courtroom and peppering his remarks with such monikers as "dumb bastard," "stupid ass," "stupid fucker," "motherfucker," "stupid motherfucker," and "asshole." The trial court accepted defendant's waivers, finding that defendant fully understood his rights, had conferred with counsel, and was acting freely and voluntarily.

Analysis

The accused's right to be present in the courtroom during every stage of his trial is guaranteed by the confrontation clause of the sixth amendment to the United States Constitution. *Illinois v. Allen*, 397 U.S. 337, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970). However, like many others, this right may be waived. *People v. Owens*, 102 Ill. 2d 145, 157 (1984). Thus, where a defendant voluntarily absents himself from a courtroom and refuses to be present for further proceedings, he is deemed to have waived his right and cannot claim any advantage on account of his absence. *Owens*, 102 Ill. 2d at 157 (holding that defendant freely and voluntarily waived his right to be present for portions of his capital sentencing hearing).

Here, there is no question that defendant freely and voluntarily waived his right to be present for his capital sentencing hearing. On no fewer than four occasions, the trial court admonished defendant of his right to be present and participate as well as the importance of making a good impression in front of the jury. On each of these occasions, defendant not only expressly waived his right to be present but also threatened to disrupt the proceedings if he was *not* removed from the courtroom. And defendant's ceaseless invective demonstrates that this was no idle threat. Under these circumstances, we have no difficulty concluding that defendant waived his right to be present for his capital sentencing hearing.

Notwithstanding *Owens*, defendant insists that the right to be present for a capital sentencing hearing cannot be waived under any circumstances. In support, defendant points to section 115—4.1(a) of the Code of Criminal Procedure of 1963, which provides:

"If a defendant absents himself before trial on a capital felony, trial may proceed as specified in this Section provided that the State certifies that it will not seek a death sentence following conviction." 725 ILCS 5/115—4.1(a) (West 1996).

According to defendant, section 115—4.1(a) represents "an absolute, unambiguous prohibition against sentencing an absent capital defendant." We disagree.

Defendant insists that we confine our analysis to section 115—4.1(a)'s plain language, and so we shall. Section 115—4.1(a) in no way prohibits the sentencing of an absent capital defendant. It prohibits only the commencement of a capital trial against a defendant who absents himself *before trial*. Defendant did not absent himself before trial. On the contrary, defendant was present throughout his trial, absenting himself only after the jury found him guilty. Accordingly, section 115—4.1(a) is wholly inapplicable to this case.

In sum, we conclude that defendant freely and voluntarily waived his right to be present for his capital sentencing hearing. The trial court therefore committed no error by conducting that hearing in defendant's absence.

## AGGRAVATION EVIDENCE

Defendant next argues that, during the second phase of his capital sentencing hearing, the trial court abused its discretion by admitting certain evidence of defendant's misconduct in the Wayne County jail.

### Background

Defendant objects to the testimony of Kathy Moats, a Wayne County corrections officer. Moats testified that,

while incarcerated in the Wayne County jail awaiting trial, defendant activated the fire alarm in his cell at least four times in one night; incited other inmates to throw things at the guards; banged on his cell door for hours at a time; vandalized his cell; smeared excrement on his cell window; refused to "lock down" when ordered; flooded his cell with water; urinated on his cell floor; and made crude and vulgar remarks to Moats. Defendant contends that Moats' testimony related solely to "trivial violations of jail rules" and therefore was "not relevant to the question of whether Mr. Nielson should be executed."

It is well settled that the evidentiary rules applicable at trial are not applicable during the aggravation/ mitigation phase of a death penalty hearing. *People v. Mulero*, 176 Ill. 2d 444, 472 (1997). This is to ensure that the sentencing authority possesses the fullest information possible about not only the circumstances of the particular crime, but also about the defendant's life, character, and criminal record. *Mulero*, 176 Ill. 2d at 472. The only rule regarding the admissibility of evidence at this stage is that it be relevant and reliable, the determination of which lies within the trial court's sound discretion. *Mulero*, 176 Ill. 2d at 472.

Under remarkably similar facts, this court held that evidence of a defendant's misconduct while in jail awaiting trial reflects upon the defendant's character and therefore is admissible at a capital sentencing hearing. *People v. Stewart*, 105 Ill. 2d 22, 68-69 (1984). In *Stewart*, the defendant objected to testimony that, while in jail awaiting trial, he kicked a jailer, called several police officers names, and smeared excrement on his cell wall. The defendant argued that "his conduct in jail was an irrelevant matter and that the jury should not have considered it in determining whether the defendant should be sentenced to death." *Stewart*, 105 Ill. 2d at 68.

The court rejected this argument, holding that "the evidence *** under consideration was properly admitted as reflecting on the character of the defendant." *Stewart*, 105 Ill. 2d at 69.

Like the evidence in *Stewart*, the evidence of defendant's misconduct while in jail awaiting trial in this case reflected on defendant's character. The trial court therefore did not abuse its discretion by admitting this evidence at defendant's capital sentencing hearing.

## CAPITAL SENTENCING HEARING: CLOSING ARGUMENTS

Defendant next argues that the State made several improper arguments during the closing of the second phase of defendant's capital sentencing hearing. Specifically, defendant argues that the State (1) misstated the burden of proof; (2) speculated that defendant was likely to kill in the future; (3) speculated as to what 13-year-old Melinda Marshel's life might have been like in the future; (4) unduly emphasized the way in which defendant disposed of the bodies; (5) asserted that "Mr. Nielson's life is irrelevant in this case"; and (6) suggested that natural life in prison would diminish the value of the victims' lives.

Defendant concedes that he has waived this issue. It is well-settled that, to preserve an issue for review, a defendant must both contemporaneously object and raise the issue in a post-sentencing motion. *People v. Williams*, 181 Ill. 2d 297, 322 (1998). Defendant did not object to any of the arguments described above, nor did he challenge their propriety in his post-sentencing motion. Accordingly, we agree with defendant that he has waived review of this issue.

Defendant nevertheless argues that we should consider this issue as plain error. See 134 Ill. 2d R. 615(a). Supreme Court Rule 615(a) provides that plain errors affecting substantial rights may be reviewed on appeal,

though not objected to at trial and in a post-trial motion. 134 Ill. 2d R. 615(a). This court has held that the plain error rule may be invoked in two limited circumstances. First, the plain error rule is proper where the evidence is closely balanced, so as to preclude the argument that an innocent person may have been wrongly convicted. *People v. Vargas*, 174 Ill. 2d 355, 363 (1996). Second, a reviewing court may invoke the plain error rule where the error is of such magnitude that there is a substantial risk that the accused was denied a fair and impartial trial, and remedying the error is necessary to preserve the integrity of the judicial process. *Vargas*, 174 Ill. 2d at 363. Relief under the second prong of the plain error rule is proper only if the error is so fundamental to the integrity of the judicial process that the trial court could not have cured the error by sustaining an objection or instructing the jury to disregard the error. *Vargas*, 174 Ill. 2d at 364.

We decline defendant's invitation to consider this issue under the plain error rule. As we frequently have noted, the prompt sustaining of an objection combined with a proper jury instruction usually is sufficient to cure any prejudice arising from an improper closing argument. See *People v. Childress*, 158 Ill. 2d 275, 298 (1994); *People v. Baptist*, 76 Ill. 2d 19, 30 (1979); see also *People v. Herrett*, 137 Ill. 2d 195, 214-16 (1990) (commenting on the defendant's post-arrest silence and failure to testify was not plain error). Prejudice is even less likely where, as here, the trial court properly instructs the jury on the purpose of closing argument. See *Childress*, 158 Ill. 2d at 298.

Here, defendant's plain error argument consists of a single sentence asking us to employ the plain error rule. The balance of his argument on this issue consists solely of explaining why the alleged arguments constitute *error*, not *plain error*. He neither argues that the evidence in this case was closely balanced nor explains why the trial

court could not have cured the alleged errors by sustaining a timely objection and instructing the jury to disregard the error. Accordingly, we find the issue waived.

## JURY INSTRUCTIONS

Defendant next argues that Illinois Pattern Jury Instructions, Criminal, No. 7C.05 (3d ed. 1992), is unconstitutionally vague and confusing. In support, defendant relies upon a passage from *Gacy v. Welborn*, 994 F.2d 305 (7th Cir. 1993), in which the United States Court of Appeals for the Seventh Circuit held that Illinois' capital sentencing instructions are *not* unconstitutionally vague or confusing. *Gacy*, 994 F.2d at 314.

Faced with arguments identical to the one defendant raises, this court repeatedly has held that Illinois' capital sentencing instructions are not unconstitutionally vague or confusing. See *People v. Hobley*, 182 Ill. 2d 404, 467-70 (1998); *People v. Brown*, 172 Ill. 2d 1, 55-57 (1996); *People v. Williams*, 161 Ill. 2d 1, 59 (1994). Significantly, we cited *Gacy* in each of these cases. See *Hobley*, 182 Ill. 2d at 468; *Brown*, 172 Ill. 2d at 57; *Williams*, 161 Ill. 2d at 59. Defendant provides no persuasive reasons to reconsider these holdings, and we therefore reject his argument.

## EXTENDED-TERM SENTENCES

Defendant next argues that he should not have received extended-term prison sentences for concealing the Marshels' deaths. We agree.

A Class 3 felony, concealment of a homicidal death carries a prison term of two to five years. 730 ILCS 5/5—8—1(a)(6) (West 1996). The trial court, however, imposed an extended term of 10 years' imprisonment for each of defendant's convictions, concluding that defendant's abuse and mutilation of the bodies demonstrated "exceptionally brutal or heinous behavior indicative of wanton cruelty." See 730 ILCS 5/5—5—3.2(b)(2) (West 1996).

We agree with defendant that the concealment of a homicidal death cannot be exceptionally brutal or heinous and indicative of wanton cruelty. This court defines "heinous" behavior as behavior that is " ' "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal." ' " *People v. Lucas*, 132 Ill. 2d 399, 445 (1989), quoting *People v. La Pointe*, 88 Ill. 2d 482, 501 (1981), quoting Webster's Third New International Dictionary 1050 (1971). "Brutal" behavior is behavior that is " ' "grossly ruthless, devoid of mercy or compassion: cruel and cold-blooded." ' " *Lucas*, 132 Ill. 2d at 445, quoting *La Pointe*, 88 Ill. 2d at 501, quoting Webster's Third New International Dictionary 286 (1971). Finally, "wanton cruelty" requires "proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense." *People v. Pastewski*, 164 Ill. 2d 189, 194 (1995).

Certainly, the trial court did not err in concluding that defendant acted brutally and heinously when he burned the Marshels' bodies, stuffed them into a duffle bag, and sank them in a pond. Such behavior is undoubtedly hateful and evil, evincing a complete lack of compassion and mercy. However, to justify an extended-term sentence, defendant also must have demonstrated wanton cruelty, which, as we define it, cannot be perpetrated on a corpse. One simply cannot consciously seek to inflict pain and suffering on a dead body, as a dead body feels nothing.

Accordingly, we hold that the trial court erred in imposing extended-term sentences for defendant's concealment convictions. Defendant's behavior was undoubtedly brutal and heinous, but it could not have evinced wanton cruelty as this court defines it. As the trial court clearly intended to impose the maximum sentence available, we modify the trial court's judgment and reduce the sentences for defendant's concealment convictions from 10 years' to 5 years' imprisonment.

CONSTITUTIONALITY OF THE DEATH PENALTY

Defendant's final argument is that the Illinois death penalty statute is unconstitutional because it places a burden of proof on the defendant that precludes meaningful consideration of mitigating evidence, allows the sentencer to weigh a vague aggravating factor, and fails to minimize sufficiently the risk of arbitrarily or capriciously imposed death sentences. This court has previously considered and rejected each of these claims. See *People v. Kliner*, 185 Ill. 2d 81, 177-78 (1998); *People v. Mulero*, 176 Ill. 2d 444, 480-81 (1997); *People v. Gilliam*, 172 Ill. 2d 484, 522-23 (1996); *People v. Taylor*, 166 Ill. 2d 414, 439-40 (1995). Defendant offers no compelling reason why this court should reconsider these decisions, and we therefore reject defendant's claims. See *Kliner*, 185 Ill. 2d at 178.

CONCLUSION

The judgment of the circuit court is affirmed as modified. We direct the clerk of this court to enter an order setting Tuesday, November 16, 1999, as the date on which the sentence of death, entered by the circuit court of Wayne County, shall be carried out. Defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1996)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed as modified.*

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Nielson's convictions should not be disturbed and that we should reduce the sentences on his concealment convictions to five years' imprisonment. In my view, however, we should also set aside Nielson's death sentence. For the reasons set forth in my dis-

sent in *People v. Bull*, 185 Ill. 2d 179 (1998), this state's present death penalty law does not meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Because the law is unconstitutional, Nielson should be resentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1996). Because he was found guilty of murdering more than one victim, the term of his imprisonment must be natural life. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1996).