NOTICE

Decision filed 10/17/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210267-U

NO. 5-21-0267

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 20-CF-111 |
| | ) | |
| CHRISTOPHER E. GLASS, | ) | Honorable |
| | ) | Christopher W. Matoush, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Boie concurred in the judgment.
Justice Cates specially concurred.

**ORDER**

¶ 1    *Held:*    The trial court did not err in denying defendant's motion to suppress where he failed to unambiguously and unequivocally invoke his right to remain silent.

¶ 2    On April 30, 2020, the State charged the defendant, Christopher E. Glass, with first-degree murder (720 ILCS 5/9-1(a)(2) (West 2020)) and concealment of homicidal death (*id.* § 9-3.4(a)). On November 12, 2020, the defendant filed a motion to suppress statements he made during custodial interrogation, alleging that the officers failed to scrupulously honor his invocations of the right to remain silent. The Honorable Kimberly G. Koester denied the motion, finding the defendant's statements to be ambiguous, and not a clear, unequivocal invocation of his right to remain silent. Following a jury trial, the defendant was found guilty of both charges and sentenced to consecutive prison terms of 50 years and 5 years, respectively, in the Illinois Department of

1

Corrections followed by 3 years of mandatory supervised release. The defendant filed a motion for new trial, alleging that Judge Koester erred in denying his motion to suppress and that he was denied effective assistance of counsel. After the denial of the defendant's motion for new trial, he filed a timely appeal.

¶ 3                                            I. BACKGROUND

¶ 4     In early April 2020, Kimberly Mattingly's mother became concerned when her daughter had not called for a few days. Her mother told police that the last time she heard from her daughter, Mattingly was with the defendant and that she had used the defendant's cell phone to place the call. Police began searching for Mattingly and interviewed the defendant, among others. On two separate occasions the defendant told police that the last time he had seen Mattingly, she was leaving his house in a car driven by a male with sandy hair.

¶ 5     On April 28, 2020, police executed a search warrant on property owned by the parents of the defendant's friend, Aaron Kaiser, where Mattingly's body was found buried in a shallow pit filled with water from recent heavy rains. Following this discovery, police wanted to resume questioning the defendant when they learned he had been picked up for violating the terms of his Illinois parole and taken to an Indiana jail.

¶ 6     Illinois State Police Special Agents Daniel Rossiter and Jennifer Smit traveled to Indiana to interview the defendant. After Mirandizing the defendant, the agents began questioning him about the parole violation but shifted to asking about Mattingly's disappearance. During the interrogation, the defendant eventually made incriminating statements that were used against him at trial.

¶ 7                                    A. Motion to Suppress

¶ 8      Prior to trial, the defendant filed a motion to suppress his custodial statements to police alleging, *inter alia*, that he had invoked his right to silence, that his invocation was not honored by the interrogating officers, and that he did not knowingly and intelligently waive his right to silence. Specifically, the defendant claimed that he invoked his right to remain silent when, approximately 2½ hours into the interrogation, he sat up in his chair, turned his body away from Agent Rossiter, and stated, "Let's stop this whole conversation … I'm done with this conversation, sir." He alleged his second invocation of his right to silence was when he asked the officers "why do you need me to say this?" before ultimately stating, "Let's just fucking do this. Let's get this over with. I'm done fucking talking." The defendant maintained that when he made these statements, Agent Rossiter instructed him to "stop and listen" and continued to question him until at last he made several incriminating statements. At the suppression hearing, the State brought to the trial court's attention a third comment made by the defendant that could arguably be an invocation of his right to remain silent: "I don't want to talk anymore. I don't know if the evidence is against me or for me. I don't know what's going on. But I do know that I didn't fire more than one shot." During the suppression hearing, the State pointed out that the defendant's motion failed to give the full context of his first statement: "You sound like you're telling the story and I'm just agreeing with you. You can tell the story anyway you want. Let's stop this whole conversation. I am done with this conversation, sir."

¶ 9      Agent Rossiter was called as a witness on behalf of the State. He testified that he advised the defendant of his *Miranda* rights, and the defendant did not give any indication that he did not understand them. The defendant signed a document waiving his *Miranda* rights and agreed to speak with the agents. Agent Rossiter testified that he continued to question the defendant after

3

hearing the defendant's alleged invocations because the statements were ambiguous and that he did not believe the defendant invoked his right to remain silent at any time during the interrogation. Agent Smit also testified on behalf of the State that she participated in the interrogation of the defendant and did not hear the defendant invoke his right to silence.

¶ 10    After hearing the testimony, Judge Koester indicated that she previously had viewed the interrogation video and noted for the record that she would use the video as the actual evidence. She also indicated that she had reviewed a transcript of the interrogation, which she described as "95 percent" accurate and used as "more of an aid to the Court." In reviewing the custodial statements attributed to the defendant, Judge Koester seemed to summarize for the record what the defendant said rather than quoting the statements that could be heard on the video. She ultimately denied the motion, finding the defendant's statements to be ambiguous.

¶ 11    After the guilty verdict, the defendant filed a motion for new trial that was heard by the Honorable Christopher Matoush, who conducted the jury trial. In this motion, the defendant alleged, *inter alia*, that Judge Koester erred in denying his motion to suppress. After reviewing the interrogation video, the transcript from the suppression hearing, the case law, and hearing arguments, Judge Matoush found no error on the part of Judge Koester and denied the motion for new trial.

¶ 12    The following facts are relevant to our analysis. At trial, Agent Rossiter testified that the defendant initially said he last saw Mattingly when she left Kaiser's property around noon on the day in question. However, the defendant's recollection changed at various times during the interview.

¶ 13    The defendant acknowledged that he had been using "a little bit" of meth that day. When Agent Rossiter asked whether he shot Mattingly more than once to put her "out of her misery," the

4

defendant insisted that he had not found her when he returned to Kaiser's property, but two questions later, he admitted he found her after Agent Rossiter informed him that Mattingly's body had been discovered.

¶ 14    The defendant told the agents he had struggled with Mattingly over a backpack containing a chrome revolver. Agent Rossiter testified that in describing the incident, the defendant first stated that the gun was in his left hand when it went off, but later the defendant stated that the backpack was in his left hand when the gun, which was inside the backpack, went off and hit Mattingly in the stomach. The defendant said that after Mattingly was shot, he fled the property, assuming that other people there would call an ambulance. The defendant said he did not know what had happened after that, but he insisted he had not found Mattingly when he went back to Kaiser's property.

¶ 15    The defendant later admitted to the agents that while the first shot into Mattingly's stomach was an accident, he stayed on the property for several hours, then went back, checked Mattingly's pulse, found no signs of life, and fired another round into her chest or head. The defendant stated that he and Kaiser then wrapped Mattingly in a thick tarp and put her in a hole nearby.

¶ 16    The defendant was found guilty on all charges. This appeal follows.

¶ 17                                    II. ANALYSIS

¶ 18                               A. Standard of Review

¶ 19    The defendant maintains that this court's review should be *de novo* so that we may assess for ourselves the defendant's custodial statements, while the State maintains that we should apply a bifurcated standard of review. In general, reviewing courts apply a bifurcated standard of review to a lower court's ruling on a motion to suppress statements: deference under a manifest-weight standard to the lower court's credibility determinations and findings of fact, and *de novo* review

5

on questions of law, including the ultimate question of whether the statements should have been suppressed. *People v. Tucker*, 2022 IL App (1st) 172982, ¶ 36, *appeal denied*. Here, however, the lower court made clear that its credibility determinations and findings of fact were based on its view of the interrogation video and not the live testimony at the suppression hearing. Thus, because we are reviewing the same evidence that the lower court reviewed, we conclude that our review of its ruling on the motion to suppress is *de novo*. *People v. Flores*, 2014 IL App (1st) 121786, ¶ 35.

¶ 20 The defendant, the State, and the circuit court presented slightly different versions of the defendant's custodial statements. Based on our careful review of the interrogation video, we find the following to be the defendant's custodial statements which he alleges were invocations of his right to silence.

¶ 21 Approximately 1 hour and 10 minutes into the interrogation, the defendant became visibly upset when Agent Rossiter accused him of previously having stated that the gun was in his hand when it went off and shot Mattingly. The following colloquy ensued:

"DEFENDANT: No. You asked me which hand the bag was in. The bag was in my hand. The gun was never in my—

AGENT ROSSITER: Chris, we're going backwards here, man.

DEFENDANT: —hand. No, we're not. You're trying to put words in my fucking mouth, and I ain't doing shit. I didn't do it. I didn't do nothing like that. Yeah, there was an accidental fucking gunshot wound, yes. You're trying to tell me I stayed there when I know fucking well I left. I came back.

AGENT ROSSITER: Chris. Chris, come on.

DEFENDANT: Don't put words in my mouth, man.

6

AGENT ROSSITER: I'm not. I'm allowing you to tell me the words that you want to tell me.

DEFENDANT: You sound like you're telling the story, and I'm just agreeing with you. You tell the story however you want.

AGENT ROSSITER: Just stop. Stop.

DEFENDANT: You know what? Let's just stop this whole conversation. How about that? I'm done with this conversation, sir.

AGENT ROSSITER: Look, Chris, this is important.

DEFENDANT: Yeah. It's real important.

AGENT ROSSITER: This is the most important moment of your life.

DEFENDANT: Yeah, I ain't got one any more."

¶ 22    As the interview progressed, the agents were attempting to establish that, contrary to his original statements, the defendant had found Mattingly alive when he returned to Aaron's property.

"DEFENDANT: I don't know.

AGENT SMIT: Oh, come on.

DEFENDANT: I really don't know. She was in the woods somewhere.

AGENT ROSSITER: Chris.

DEFENDANT: I don't know where she was at.

AGENT ROSSITER: Where in the woods?

DEFENDANT: I don't know.

AGENT SMIT: You guys found her. Come on, Chris. Like, let's keep moving in the right direction. We know where we're at. We know where we're going.

7

DEFENDANT: Why do you need me to say this if you guys know everything already? You just want that sweet conviction for you?

AGENT ROSSITER: No, man, that's not it.

DEFENDANT: That's what it sounds like.

AGENT ROSSITER: Chris, I—

DEFENDANT: Just fucking do it. Let's go.

AGENT ROSSITER: No, Chris. Stop. Just stop and listen.

DEFENDANT: I'm done fucking talking.

AGENT ROSSITER: Stop and listen, okay? Look. Like, like we've told you. We want to know what actually happened, okay?

DEFENDANT: Sounds like you already know what happened.

AGENT ROSSITER: Look, everyone has a story to tell. Whether it's true. Whether it's half true. Whether it's—it's bullshit. Everyone has a story to tell. And you are the only one who knows exactly what happened. Everyone else is just filling in the blanks. And I would hate for your—you to be told that you are responsible for certain things that you didn't do because of somebody else's story, because you chose not to tell the story today. You chose to stay silent and not try and help yourself. You chose to keep inside the fact that you felt, when this altercation initially occurred, that this was a struggle that you were both combatants. That you were both fighting for this gun and it just went off. Okay? That after this happened, you guys panicked. You guys, like you agreed with me, you made the best decision possible at that moment, 'cause you knew it couldn't be fixed. You knew no matter what you did, you were fucked, whether calling an ambulance, taking her to a hospital, or allowing his parents to come home and see her in that condition. You knew

8

you guys were fucked. So you made the best decision possible. You knew she was going to die. And I truly believe you tried to do the best thing you could at that moment—

DEFENDANT: I didn't—

AGENT ROSSITER: —under those circumstances, and you put her out of her misery."

¶ 23 Finally, as Agent Rossiter continued to press the defendant on whether he or his friends had shot Mattingly more than once to "put her out of her misery," the following colloquy ensued:

"AGENT ROSSITER: I truly believe that you and Aaron and whoever else was there—Kevin, I think you said was the other guy's name was—made the best decision you could with the circumstances in front of you and the resources you had. And you did the best you could. And you actually had her feelings in mind, so she didn't feel pain anymore. Am I close?

DEFENDANT: I ain't—I don't want to talk any more. You know, I don't know whether the evidence is against me or for me. I don't know what's going on. But I do know that I didn't—

AGENT ROSSITER: Chris, you know we—

DEFENDANT: —I didn't fire more than one shot.

AGENT ROSSITER: Chris—

DEFENDANT: And I didn't—

AGENT ROSSITER: You know we found her. You know we found her. Okay?

DEFENDANT: Obviously."

9

¶ 24                    B. Alleged Invocation of the Right to Silence

¶ 25    At the outset, we note that on appeal the defendant argues interchangeably that the circuit court erred in denying his motion to suppress the video of his custodial interrogation and erred in denying his motion to suppress his custodial statements. However, our review of the record reveals only that a motion seeking to suppress his custodial statements was filed by the defendant, and, therefore, we will focus our review accordingly.

¶ 26    The defendant contends that the circuit court erred in denying his motion to suppress where he invoked his fifth amendment right to silence, the interrogating police officers failed to scrupulously honor that right, and the error was not harmless beyond a reasonable doubt. He next contends that he was denied effective assistance of counsel where his trial attorney failed to object to the jury being able to see the portions of his interrogation video in which he sought to invoke his right to remain silent.

¶ 27    The United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 471 (1966), held that before an accused can be subject to custodial interrogation, he must be advised of his rights including the right to remain silent, the right to consult with an attorney, and the right to have an attorney present with him during interrogation. The United States and Illinois Constitutions provide that no person shall be compelled to be a witness against himself in any criminal case. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. Even where a suspect initially waives his rights and agrees to talk to police, the interrogation must cease if he indicates "in any manner" prior to or during questioning that he wishes to remain silent. *Miranda*, 384 U.S. at 444-45. The invocation of the right to remain silent, however, must be unambiguous and unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). Whether an alleged invocation is clear and unambiguous is dependent on how a reasonable officer

10

would perceive the defendant's words. *Davis*, 512 U.S. at 459. "This right to silence may be invoked either verbally or through conduct that clearly indicates a desire to end all questioning." *People v. Diaz*, 377 Ill. App. 3d 339, 347 (2007). "If verbal, the individual's demand to end the interrogation must be specific." *Id.* The defendant's statement cannot be evaluated in isolation, but "must be examined in the factual context of its utterance." *People v. Milner*, 123 Ill. App. 3d 656, 660 (1984).

¶ 28    After filing his initial brief, we granted the defendant leave to cite as additional authority *People v. Ward*, 2023 IL App (1st) 190364, a published decision from another district issued on March 31, 2023. The defendant maintains that the similarities in *Ward* to the instant case make it particularly illustrative. We do not agree. The defendant in *Ward* asserted that he invoked his right to silence during custodial interrogation on three occasions when he stated: "I ain't got nothin' else to say"; "[g]ot nothin' to say"; and "don't want to say nothing else about it." *Id.* ¶ 102. After each of the three times the defendant in *Ward* alleged that he invoked his right to silence, the detectives took a break but then eventually resumed questioning him. *Id.* ¶ 102. After being held for approximately 12 hours, the defendant ultimately made several inculpatory statements to a second team of detectives. *Id.* Defense counsel challenged the statements in a motion to suppress, but the trial court denied the motion and permitted the prosecution to use the statements at trial. *Id.* ¶¶ 65-66. Reviewing *de novo*, the First District reversed and remanded, finding that the defendant's invocations of his right to silence were clear and unequivocal; that the State had not attempted to argue that the police scrupulously honored the invocations; and that the error was not harmless beyond a reasonable doubt. *Id.* ¶¶ 120-24.

¶ 29    Here, the defendant argues that the invocations in *Ward* were so similar to his statements that we are compelled to find his statements to be unequivocal invocations of his right to silence.

11

We decline the defendant's invitation to examine his statements in isolation by comparing them to those made in *Ward*. Rather, viewing the defendant's videotaped statements in the context of the entirety of the custodial interrogation, we do not find that the defendant unambiguously and unequivocally invoked his right to silence such that a reasonable officer would perceive the defendant's words as a desire to end all questioning. *Davis*, 512 U.S. at 459; *Diaz*, 377 Ill. App. 3d at 347. To the contrary, the defendant's statements, taken in context, were not a request to terminate the interrogation. His statements indicated that he was frustrated with the questions being asked by the agents.

¶ 30    The defendant next argues that his nonverbal conduct should have indicated to a "reasonable person" that he "was ready to be taken to a cell and be done with the interrogation." In support of his argument, he cites *People v. Nielson*, 187 Ill. 2d 271, 287 (1999) (nonverbal conduct relevant in weighing whether defendant "clearly indicate[d] his desire to cut off questioning" (internal quotation marks omitted)). In viewing the videotaped interrogation, we observed that throughout most of the questioning the defendant was leaning back against the wall with his body facing away from the table. He spoke softly when he answered questions. However, after being accused of stating that the gun was in his hand when it went off and shot Mattingly, the defendant became visibly upset, and his voice became louder when he stated, "You sound like you're telling the story, and I'm just agreeing with you. You tell the story however you want." At that point, the defendant turned his body towards the table for the first time. He remained facing the table and engaged in conversation with the officers until the agents attempted to get the defendant to admit that he had, in fact, found Mattingly when he returned to Aaron's property. At that point, the defendant stated, "Just fucking do this. Let's go," and he turned away from the table and took his original position with his back up against the wall.

12

¶ 31    Based on our meticulous review of the videorecorded interrogation, we cannot conclude that the defendant's nonverbal conduct clearly indicated the defendant's desire to end all questioning. *Diaz*, 377 Ill. App. 3d at 347. Nor did we observe that his nonverbal conduct rose to the level of an unambiguous and unequivocal invocation such that a reasonable officer would have known that the defendant wished to remain silent.

¶ 32    Although a defendant has the right to terminate an interrogation by invoking his right to remain silent, it does not appear from the record before us that the defendant did so here. We do not find that the defendant's statements, taken in context, rise to the level of an unambiguous and unequivocal invocation of his right to remain silent. Nor do we find the defendant's nonverbal conduct was a clear invocation of his right. Because we find that the defendant did not invoke his right to silence, we need not address the defendant's remaining arguments.

¶ 33                              III. CONCLUSION

¶ 34    Accordingly, we affirm the judgment of the trial court and the defendant's convictions.


¶ 35    Affirmed.


¶ 36    JUSTICE CATES, specially concurring:

¶ 37    I agree that the trial court did not err in denying the defendant's motion to suppress, and concur in the majority's decision to affirm the defendant's convictions. I write separately because I do not agree with my colleagues' findings that "the defendant's statements, taken in context, were not a request to terminate the interrogation," but rather that "[h]is statements indicated that he was frustrated with the questions being asked by the agents" (*supra* ¶ 29). In this case, the video shows that the defendant's assertion that he was "done with the conversation" and "done fucking

13

talking" came within the context of a rapid back and forth exchange with the detective, as the defendant and the detective talked over each other. A defendant may invoke his right to remain silent with words, nonverbal conduct, or both, but the invocation of the right to silence must be unambiguous, unequivocal, and clear. See, *e.g.*, *People v. Nielson*, 187 Ill. 2d 271, 287 (1999). After reviewing the video, with attention to the defendant's words and his nonverbal conduct, I agree with the trial court's finding that the defendant's invocation was ambiguous. This was a close case, but the defendant's statements fell short of a clear and unambiguous demand to end the interrogation. Accordingly, I specially concur.