NOTICE
Decision filed 11/04/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230439-U

NO. 5-23-0439

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 22-CF-171 |
| | ) | |
| CARLOS SAUCEDO-NAVA, | ) | Honorable |
| | ) | Jeffery S. Geisler, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's judgment and sentence are affirmed where the State's motion for leave to file an additional count was properly granted, trial counsel did not provide ineffective assistance of counsel, and the State presented sufficient evidence to prove the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

¶ 2    Following a bench trial, defendant, Carlos Saucedo-Nava, was convicted on two counts of aggravated domestic battery with the court finding the second offense was accompanied by exceptionally brutal or heinous conduct indicative of wanton cruelty. Defendant was sentenced to 12 years in the Illinois Department of Corrections. Defendant appeals, arguing that the trial court erred in granting the State's motion for leave to file an additional count because the count was subject to compulsory joinder and the speedy-trial term had already expired when the count was added. He further argues that his trial counsel was ineffective for failing to move to dismiss the

1

count and the trial court's finding of wanton cruelty was in error. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On September 13, 2022, defendant was charged, by information, with two counts. Count I alleged attempted first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West 2022)) in that defendant repeatedly struck Destiny Ritchie-Moore on her head and face. Count II alleged aggravated domestic battery in violation of section 12-3.2(a)(1) of the Code (*id.* § 12-3.2(a)(1)) in that defendant repeatedly struck and kicked Destiny in the head and face resulting in a fractured orbital bone. The charges stemmed from an incident on September 3, 2022. A pretrial bond report, filed on September 13, 2022, revealed defendant had two prior convictions for domestic battery dated January 11, 2021, and April 1, 2021. The January conviction was a Class A misdemeanor for which defendant received 10 days in jail. The April case, which involved Destiny, was a Class 4 felony for which defendant received 24 months' probation. Defendant was arraigned on September 13, 2022, and upon defendant's request, a public defender was appointed.

¶ 5     A pretrial hearing was held on October 31, 2022. Defense counsel moved for a continuance. The State had no objection, and the court granted the motion. Defense counsel requested a second continuance at the December 28, 2022, pretrial hearing. The State again had no objection, and the court granted the motion. On January 23, 2023, the trial court set the case for a jury trial on March 6, 2023; however, on February 16, 2023, defense counsel advised the court that defendant wished to waive his right to a jury trial. Following admonishments, the court found defendant knowingly and voluntarily waived his right to a jury trial and set the case for a bench trial on March 27, 2023.

¶ 6    On March 20, 2023, the State filed a motion for leave to file an additional count against defendant. The motion noted that, as currently charged, defendant did not qualify for extended term sentencing based on prior convictions but would qualify for extended term sentencing if the court made a finding of wanton cruelty. The proposed information for count III alleged aggravated domestic battery in violation of section 12-3.2(a)(1) of the Code (*id.*) and stated defendant knowingly caused great bodily harm to Destiny by repeatedly striking and kicking "her in the hand [*sic*] and face," resulting in Destiny sustaining a fractured orbital bone. The count further alleged the act was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The State also filed a motion *in limine* requesting the admission of evidence at trial related to previous claims of domestic violence between defendant and Destiny pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2022)).

¶ 7    On March 27, 2023, the court heard arguments related to the State's motion for leave to file an additional count. The State argued that the statute permitted

> "the Court to impose an extended term sentence on a defendant if the *** finder of fact, makes a specific finding that the crime was exceptionally brutal or heinous behavior indicative of wanton cruelty. So[,] I'm going to ask the Court to not only find the defendant guilty of the aggravated domestic battery, but also to make the specific finding to change the sentencing range."

¶ 8    Defense counsel argued that,

> "The motion to add additional Count III was served on me one week ago today. This matter has been on file since *** September of 2022, well over 120 days to add an additional count. I appreciate that it is simply to add another proof factor, and that is the wanton misconduct that would allow the Court to impose an extended term.

3

However, [defendant] has made certain significant decisions based upon the charges that were filed of which he was aware, and most significantly, his right to jury trial, and that's why we're set for bench trial today.

To allow the State to now seek to double his possible incarceration, should he be found guilty on that count, I believe is not fair, it is not conscionable, and I would ask the Court to deny the motion."

In response, the State argued that the statute prohibited defense counsel from objecting to a late filing and stated it had "the right to make this filing at any time before the trial."

¶ 9 Following argument, the court found that cause was shown and granted the motion for leave to file an additional count, finding it was "essentially the same as the aggravated domestic battery that's on file, except for the fact that the words 'exceptionally brutal or heinous behavior indicative of wanton cruelty' [are] added." The court also granted the State's motion *in limine*. After addressing offers provided to defendant, the trial court arraigned defendant on count III and proceeded with defendant's trial.

¶ 10 Following opening statements, the following testimony was provided. Dr. Matthew Albrecht testified that he was the emergency medicine physician at Decatur Memorial Hospital (DMH) who treated Destiny on September 3, 2022. When he first saw her, he noted "massive facial trauma" and stated her "face was basically swollen shut." He testified that he was concerned the swelling would increase, cut off her airway, and she would asphyxiate. While hospitalized, Destiny was vomiting and had a decreased heart rate. A breathing tube was placed, and Dr. Albrecht arranged for Destiny to be transferred to a larger trauma center due to the severity of her injuries, which included broken bones in her face. He stated that Destiny was beaten about an hour prior to admission and hit with fists and feet. He believed, given the injuries, that more than one

4

blow was inflicted. After two to four hours at DMH, Destiny was life-flighted to Springfield Memorial Hospital (SMH) by helicopter. Dr. Albrecht opined that without DMH's interventions, Destiny would have died.

¶ 11 Ronald Moore testified that he was Destiny's grandfather. He received a telephone call on September 3, 2022, from defendant telling him to pick up Destiny from his house. Ronald informed defendant that he had COVID and could not pick her up. Ronald also testified about previous verbal and physical altercations between Destiny and defendant.

¶ 12 Mikal Dillman testified that she was Destiny's mother. She received a telephone call from her mother, Elizabeth Batchelor, on September 3, 2022. Elizabeth called Mikal and stated that she was going to pick up Destiny and that Mikal needed to go with her. Mikal then called Destiny's phone. Defendant answered the phone and put it on speaker phone. Destiny stated in a very small voice, "He hurt me mom. I can't see." Thereafter, defendant said, "Don't call the police." It took about 10 minutes to get to the house. Defendant was holding Destiny up as he walked her out of the house. Her eyes were swollen shut and her face was swollen and covered in bruises. When Mikal got out of the car to take Destiny from defendant, she asked him, "What the F did you do to my daughter." In response, defendant smiled and then spit on Mikal. Mikal put Destiny in the vehicle, and as they were backing out of defendant's driveway, defendant flipped them off.

¶ 13 Thereafter, Mikal and Elizabeth debated whether they should go to the police station or the hospital. They chose the hospital and took Destiny directly to DMH. Mikal enlisted the assistance of a security guard to help take Destiny into the hospital because Destiny could not walk, and Mikal was afraid to touch her.

¶ 14 Mikal classified Destiny's relationship with defendant as "toxic" and discussed prior incidents in which she picked up Destiny following altercations with defendant. Mikal initially

5

tried to involve the police, but Destiny and defendant would lie to the police about the incidents. Mikal also stated that defendant would make "Destiny pay for it" when she contacted the police. Mikal explained that her actions only caused defendant to beat Destiny again, and therefore she stopped calling the police.

¶ 15    Mikal confirmed that she was at DMH when Destiny received treatment. Thereafter, Destiny was flown to Springfield where she was placed into a medically-induced coma. She had five facial fractures and was at SMH for about five days before she was life-flighted to Barnes Jewish Hospital in St. Louis, Missouri. Mikal stated that Destiny spent a total of 42 days in the hospital and identified pictures of Destiny taken while she was hospitalized.

¶ 16    Destiny testified that she had no memory of the events from September 2, 2022, to September 3, 2022. She agreed that she was beaten on September 3, 2022, but did not remember the incident. She had no memory of going to defendant's house. She remembered waking up at Barnes Jewish Hospital, approximately 28 days after the alleged incident. She stated that she was in a relationship with defendant for approximately two years. She testified about how they met, when the relationship started, and instances of domestic violence during the relationship.

¶ 17    On cross-examination, she admitted that she had prior convictions for domestic abuse involving her father and defendant. She further admitted that some of her pending cases were either dismissed or withdrawn by the State prior to the trial. She stated that her testimony was not influenced by defendant or his family.

¶ 18    On redirect, Destiny agreed that she and defendant had discussions about her testimony prior to the trial. She agreed that defendant wanted her to testify that she pulled a knife on him, and that he had not kicked her in the head. She also agreed that he tried to tell her exactly what to say on the stand. Destiny admitted that she talked to defendant's mother about what to say at trial.

6

Defendant's mother told her to answer the questions and help defendant but never told her to lie. She agreed that both defendant and his mother suggested that she should not appear at the trial.

¶ 19    Detective Brad Hall, of the Decatur Police Department, testified that he investigated Destiny's case and saw her at the hospital. She was already intubated when he saw her, so he was unable to speak with her. He did speak with some of Destiny's family members. Thereafter, he obtained a search warrant and presented to defendant's house. He identified photographs taken at defendant's residence and testified about the blood-like liquid seen in the home on the floor, in the bathroom, in the shower, and on the mattress. He also testified about the blood-like spatter seen on the door. He stated a knife with suspected blood on it was found in the kitchen sink and Destiny's glasses were found with a one lens broken out of the frame.

¶ 20    When defendant refused to exit the residence, the Decatur Special Weapons and Tactics (SWAT) team was called to defendant's residence. Defendant eventually came out of the house and was secured in the rear of a squad car, with no shots fired. Defendant was arrested, and before he was transported to the police station, he asked Detective Hall why he was arrested and the detective advised him of the charge of attempted murder. No other conversations occurred in the car. Defendant was placed in an interview room and read his *Miranda* rights. Defendant stated that he understood his rights and agreed to speak with the officer. Defendant's interview was recorded and played for the court.

¶ 21    The video showed defendant being read his *Miranda* rights and stating he understood those rights. Defendant stated that he lived at the residence where he was arrested for three or four months. He confirmed that he rented a room and shared the kitchen and bathroom with his roommate. After discussing his current and prior employment, as well as his previous residences, defendant eventually addressed the incident that occurred on September 3, 2022.

7

¶ 22 Defendant stated that he was trying to distance himself from Destiny, who was the mother of his child. He wanted to end the relationship because of prior instances where the police were called due to fights between him and Destiny. He stated that Destiny was the reason that he was on probation. He further stated that she ruined his life because he could no longer do the things he wanted to do and therefore no longer looked at her the same way. He would tell her to leave him alone, but she would stalk him. He could not get her away from him. He tried to give her another chance and be positive. He said they were looking to get a house together and raise their child together. Their son was three months old.

¶ 23 Defendant stated he was up all night on September 2, 2022. On the morning of September 3, 2023, Destiny called and said she was getting on the bus and coming over. He did not want her to come over, but he went to pick her up anyway. Destiny got in the shower when she arrived. He noticed her phone was turned off. He powered up the phone and saw that she was seeing someone else. He stated that he "blanked himself" completely and hit her. Deep inside he felt all the jealousy, "I felt rage," and knew that deep inside this would be the last time he was going to be with her. He thought she was loyal. After he saw the phone, everything turned different and "I beat her." "I was really upset."

¶ 24 Defendant stated that the physical altercation occurred in his bedroom. He confronted Destiny about the recipient of the naked pictures, and Destiny said it was not her. He stated there were also text messages that revealed how Destiny and the other person met up. Defendant stated that he always had a gut feeling that she was not being loyal, which was why he checked her phone. Defendant stated he was angry because he wanted to end it, but she would not let him, yet she was with someone else.

8

¶ 25    Defendant stated that the physical altercation started by him slapping Destiny in the face and then he punched her. He stated that never in his life, in any of the prior instances of domestic violence, had he hit her the way he tried to hit her that day with such anger. He stated,

> "With all the anger inside of me I hit her. And I hit her multiple times. *** I didn't know what to do. My inner self was telling me to stop but I—I couldn't face the fact that she had cheated on me. The only real reason I was with her is because I thought we had loyalty. *** I beat her. I realized that I had hit her with my actual strength, with all my strength, not with all of it, but with the strength that I had never before hit her. And I knew, I knew, something hit me. She couldn't … She couldn't move man. She normally shouts and screams and takes it y'know and gets upset. She couldn't move. She told me to help her, and I didn't know what to do. Man, I picked her up and told her to get in the shower. She was in the shower. She told me she couldn't open her eyes. I was still upset. I was telling her I didn't care. I wanted her to just cool off and rinse the blood so she could leave. I just sat there for a little bit. She fell back in the tub. I asked her how long she had been seeing the guy for and why she kept lying to me. She was still saying that it wasn't her and then she was unconscious."

¶ 26    Defendant stated that he did not hit her again when she was in the bathtub. He stated, "After I hit her, *** I felt two things. I felt the relief because I knew *** I was not going to get back with her. The only thing holding me was loyalty. There is no loyalty."

¶ 27    Defendant called Destiny's grandfather to pick her up, but he sent her grandmother. When they were leaving the house, Destiny grabbed hold of defendant, and he walked her outside. She got in her grandmother's car. Her mother was also there. He stayed at his house. When Destiny left, "she was pretty beat up. She was beat up like I never done to her before." No one else was

there. The entire altercation took place in his bedroom. He then explained where his room was in the house.

¶ 28    Defendant stated he and Destiny were together for two years. There were a few altercations where they hit each other, but nothing like what happened that day. He said he hit her "a good eight times." He did not think it was more than that. He hit her face and head using a closed fist. He only used his right hand, which was his dominant hand. He had some bruising on his hand and stated, "Lately, I've been training in the backyard with a punching bag," but confirmed the bruising and swelling on his hand was from the day of the fight. He stated that he did not try to talk to Destiny before the confrontation. It was just the rage and anger of the moment. "I blacked out at the moment." He was told that Destiny was not doing well, and he stated,

> "Man, I regret it so much. You have no idea, man. Alright. I'm going to be honest with you. I didn't think. Yes ok, after I realized actually what had happened, I knew the police were going to be involved, because I knew she was going to end up at the hospital and I knew her mom was going to call the police. But also, I regret it so much. I wish I had never hit her like that."

¶ 29    Defendant stated that Destiny went unconscious in his room. It did not happen after the first punch, but she was unconscious after it ended. He stated that he stopped hitting her because "it was going to be too much." When he was doing it, he thought it was too much. He stated that he knew the police were at his house but did not come out because he did not want to go to jail. He only came out when the SWAT team was there because he did not want the canine to come in his house, and figured he might as well cooperate.

¶ 30    Defendant stated, "I wished I had never hit her like that." He asked how Destiny was doing and was told that her injuries were serious, and she had emergency surgery. The officer stated that

Destiny was in critical condition and had life-threatening injuries, which was why defendant was charged with attempted murder. Defendant asked, "What's going to happen with me?" He was told he would be booked for attempted murder. He then asked, "Did she say what happened to her?" The officer said he "would not go into details like that." The officer left shortly thereafter to do some paperwork and defendant sat in the interview room, sighing numerous times.

¶ 31    The officer returned with water and asked if the cell phone in the bedroom belonged to defendant. Defendant said yes and the officer stated they would need to take it. The officer then took pictures of defendant's hands—front and back. The officer confirmed defendant was wearing the clothing he had on when the fight occurred. Blood was noted on the clothes. Photographs of defendant's clothing were taken. Defendant asked the officer why the charge was "attempted murder," and the officer stated it was because of Destiny's injuries. When the officer was photographing defendant's shoes, he asked if defendant kicked Destiny at all. Defendant replied, "I guess I did actually kick her *** I kicked her once in the head." Defendant confirmed Destiny was on the ground when he kicked her but stated it was more of a "push kick." He also confirmed the kick was in the "face area." The officer left again.

¶ 32    When the officer returned, he asked if there were any weapons in the house and defendant said there were not. The officer then specifically asked about a knife found on the premises. Defendant said the knife was in his bedroom, but it was not part of the altercation with Destiny. After the incident, defendant moved the knife to sink. He stated that he saw blood on it but did not wash it off. He confirmed that he never used the knife during the fight. He said the knife was on the floor and that was why it had blood and hair on it. He again said he regretted it and promised he would have "nothing to do with that girl again" and if "I get out of this one" he would have nothing to do with her. He was again told that Destiny's condition was "pretty severe." In response,

11

defendant stated, "I did it," but did not think she would have to get flown to another hospital. He agreed that his anger got the better of him and stated, "I know I'm a person that has a high temperament and it's hard to control." When asked if he got angry easily, he stated, "It's not even about getting angry easy, but when I get angry, I just lose it and blackout." Thereafter, the officer left. When the officer returned, he requested defendant's clothes and provided defendant with a jumpsuit. Once defendant changed into the jumpsuit, he was cuffed and removed from the interview room.

¶ 33 After the video was played, the officer confirmed that he took photographs of defendant's clothing and later took the clothing as evidence. He stated that he saw no injuries on defendant's body when he took defendant's clothing, other than the injuries on defendant's hand that revealed bruising and swelling. He stated that blood spatter was seen on defendant's clothing. On cross-examination, the officer confirmed that the red matter was not tested and, therefore, he could only state that it was "consistent with blood." He identified the shirt worn by defendant when he was arrested. After submitting all its evidence, the State rested.

¶ 34 Defendant testified that when he told the detective that he kicked Destiny during the interview, it was not really a kick, it was more of a push. He stated that he did not explain it to the officer because he "was tired." He stated that he "didn't strike kick her" and "didn't use any force in it." He explained the kick was more like a tap of his toe, not a kick. Defendant testified that he believed that he struck Destiny about eight times. He stated that he did not tell police that Destiny attacked him first because she was on probation at the time, and he did not want to incriminate her by telling the police. He stated that Destiny "charged at me with a knife" after he confronted her about the phone messages. When he tried walking away, she tried to pin him to the floor. She was unable to do that, and he managed to break free with his hands. Thereafter, she started to strike

12

him in the face, ear, and chest. He stated that the knife in the sink picture was the same knife Destiny used on him.

¶ 35    Defendant agreed that the argument started because of messages he found on Destiny's phone. He was concerned that she was being unfaithful to him. He told her he was done with her, might have cussed at her, and tried walking out of the room. She then grabbed him by the waist and tried to knock him to the floor. He was able to break free and then Destiny began to hit him in the chest, ear, and head. He then pushed Destiny back onto the bed. She got up and kept hitting him. He then slapped her. She reached for the knife and charged him. She only managed to cut his shirt. He noted the hole or rip on the left side of the shirt. After that, he grabbed Destiny by the hair and punched her a few times. Then she swung at him with the knife and that was when she cut his shirt. After that, defendant "continued to kind of throw her around the room," and punched her another three or four times. That was when she dropped the knife and fell to the ground. Defendant stated that once Destiny dropped the knife and fell to the ground, he did not strike her again. He realized that she may have been hurt. Her face was swollen, and he thought cold water would decrease the swelling so he put her in the shower and asked if there was anything else he could do. He then called her family for help. He stated that he did not tell the officer all of what happened because he did not think it was going to get this serious, and Destiny was already on probation for hitting him, "so [he] didn't really want to incriminate her and make it more of a deal." He thought that by taking the fall, he would have "probably just bonded out on aggravated domestic battery or something."

¶ 36    On cross-examination, defendant stated that he did not tell the officer what really happened. He agreed that he left out the part where Destiny was the aggressor. He said his apology during the interview, *i.e.*, that he was sorry for what he did to her, was true. He agreed that the fight was

13

because he was jealous but disputed that he went into a rage. He disputed the veracity of his statements during the interview. He further disputed the veracity of statements about "how he never saw her the same way again after she was placed on probation," that "with all the anger inside of me, I hit her multiple times. My inner self said to restrict yourself," but he wanted to hurt her, so he disregarded his inner voice. He disagreed that he went into what he called "blackout state" during his interview where he said he blacked out with rage and anger. He stated that he did not blackout at any time and only said that to the officer so he "didn't have to say more."

¶ 37   Defendant stated he picked Destiny up at the bus station the morning of the altercation and was making breakfast. While she was in the shower, he looked at her phone and found a nude picture and messages between her and another guy. He then waited in the kitchen to confront her about what he found on her phone. She kept denying that it was her and stated it was someone else. He stated that he was tired of listening to her lies and did not believe her. He agreed that his testimony at the hearing was different from that in the interview and stated that he did not want to tell the story to the officer. He stated that he did not tell the whole truth when he was talking to the officers. He said he tried to walk away after he told her it was over. He stated that he was 6 feet tall, 190 pounds, but did not regularly work out. He said that when Destiny got him with the knife, it was not a full cut. It did not pierce enough for there to be blood, but there was a slight scratch. As to many of his statements regarding his anger during the interview, defendant said he lied about that as well as kicking Destiny while she was on the floor.

¶ 38   Defendant agreed that Destiny's mother picked her up following previous fights. He stated that he never saw any injuries on Destiny and was only defending himself during those incidents. Defendant's evidence, consisting of the shirt defendant was wearing on the day of the incident and the knife, was admitted. Thereafter, defense counsel rested.

14

¶ 39    The court found defendant was not credible. It found the State proved count II and then moved to count III, finding defendant's actions were "an unprovoked attack. It was senseless in its nature. The number of wounds that were inflicted, punching somebody, whether it be six, eight, or how many times, in the Court's mind is clearly a senseless act." The court further noted defendant's actions

> "put the victim in the hospital, not for a short stay, but for a 42-day stay, part of which she was in a coma induced because of this. So as far as looking at the injuries inflicted and the defendant just beating the alleged victim in this case, it is more than clear to the Court that this was exceptionally brutal or heinous behavior that was indicative of wanton cruelty. There's a little more to this case than somebody who just punches somebody once or twice. It is clear to the Court that he consciously sought to inflict pain and suffering. He was in a rage and beat her well beyond what could be considered not attempting to cause some harm to her."

¶ 40    The court found the State proved count III and stated, as to defendant's claim that he did not kick Destiny, that "as far as the foot and kicking, *** I find the defendant did kick her, not try to nudge her and tell her to get up." The court found the State failed to prove the attempted first degree murder charge (count I) and set the case for a sentencing hearing on June 5, 2023.

¶ 41    On April 10, 2023, defendant filed a motion to reconsider the court's finding of guilt. The motion claimed, *inter alia*, that defendant presented sufficient evidence regarding his self-defense claim and the State failed to provide sufficient evidence of wanton cruelty because there "was no evidence of prolonged pain or suffering, cold blooded behavior or a lack of mercy." The motion further argued, regarding count III, that the court erred in allowing the State to file the charge because defendant already waived his right to a jury trial when the count was filed and had

15

defendant known, he "may not have waived his right to a jury trial given the enhanced penalty and the additional element of proof."

¶ 42    The motion for reconsideration and sentencing hearing were held on June 5, 2023. After defense counsel declined the opportunity to present oral argument on the motion, the trial court denied the motion and moved on to the sentencing hearing. The State placed copies of telephone conversations between defendant and his mother as evidence. The transcripts revealed, *inter alia*, that defendant wanted Destiny to say she came at him with a knife, or anything else that would help his case, including that she had no memory of the incident, or just not show up for trial. The second exhibit revealed that defendant was caught making "hooch" (alcohol) in the jail on April 18, 2023. Mikal provided a statement about Destiny. No evidence was submitted by defense counsel. Defendant apologized to Destiny's mother and said he would try to be a better person.

¶ 43    The State asked for the court to sentence defendant to 14 years. Defense counsel asked for a sentence of three years, but no more than eight years so defendant could participate in the Impact Program. The trial court sentenced defendant to 12 years on count II at 85% and merged count II with count III. Defendant was admonished regarding his appeal rights. On June 6, 2023, defendant moved for reconsideration regarding his sentence, claiming the sentence was excessive considering defendant's minimal criminal history. The hearing on the motion was held on June 8, 2023, at which time the trial court denied the motion. Defendant timely appealed.

¶ 44                                    II. ANALYSIS

¶ 45    On appeal, defendant first argues that the trial court erroneously granted the State's motion for leave to add an additional count. In support, he argues that the third count was subject to the compulsory joinder rule and the speedy-trial term expired prior to the State bringing count III. He further argues that his trial counsel was ineffective because counsel failed to request dismissal of

16

count III for those reasons. Finally, defendant argues that the State failed to prove exceptionally brutal or heinous behavior indicative of wanton cruelty required for enhanced sentencing. In response, the State argues that count III was not subject to compulsory joinder, the speedy-trial term was not expired, and therefore, trial counsel was not ineffective in failing to request dismissal of count III. It further argues that the trial court's finding of wanton cruelty was supported by sufficient evidence.

¶ 46                          A. Compulsory Joinder and Speedy Trial

¶ 47    Our review of the record reveals that defendant's first argument, claiming error related to compulsory joinder and speedy trial, was not preserved before the trial court. To preserve an issue for appeal, a defendant must object to the issue at trial and raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). While defendant's objection briefly mentioned "120 days," which would be sufficient to address issues of speedy trial, no mention of speedy trial or the "120 days" was made in defendant's posttrial motion requesting reconsideration of defendant's guilt. Instead, that pleading only alleged error on the trial court's granting of the State's motion for leave to add an additional count by arguing that defendant had already "waived his right to a jury trial" by that time and that defendant "may not have waived his right to a jury trial given the enhanced penalty and the additional proof element." No argument was ever presented for compulsory joinder.

¶ 48    Where such issues might be forfeited due to a failure to make the proper objection and argument in a posttrial motion, Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) will allow for consideration of an issue on appeal if the error affected substantial rights. "The plain-error doctrine is a narrow and limited exception" to the rule of forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). A defendant may only obtain relief under this doctrine by first showing that a

17

clear or obvious error occurred, and the burden of persuasion lies with the party claiming plain error occurred. *Id.* However, for this court to determine that issue, the appealing party must first request review under the plain-error doctrine. *Id.* A defendant who fails to request plain-error review obviously cannot meet the burden. *Id.* Here, defendant neither requested plain-error review nor presented an argument as to why the trial court's decision fell within the confines that would allow for plain-error review. Accordingly, we will honor defendant's forfeiture and decline to address the arguments related to compulsory joinder and speedy trial presented on appeal.[1]

¶ 49                    B. Ineffective Assistance of Trial Counsel

¶ 50    Defendant also argues that his trial counsel was ineffective for failing to file a motion to dismiss count III when it violated his right to a speedy trial. Claims for ineffective assistance of counsel are analyzed under the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984), as adopted in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984).

¶ 51    "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23. This requires a defendant to show "that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). A failure to satisfy either *Strickland* prong "precludes a finding of ineffective assistance of counsel." *People v. Henderson*, 2013 IL 114040, ¶ 11.

---

[1]The argument presented to the trial court regarding defendant's decision to waive a jury trial was not raised on appeal and, therefore, is not an issue addressed in this decision.

¶ 52    Here, defendant's claim is based on counsel's failure to file a motion to dismiss count III based on compulsory joinder and speedy-trial principles. When a claim of ineffective assistance of counsel is based on the failure to file a motion, the defendant must establish that the unargued motion would have been meritorious and that a reasonable probability exists that the trial outcome would have been different if the motion was granted. *Id.* ¶ 15.

¶ 53    "In Illinois, a defendant has both a constitutional and a statutory right to a speedy trial." *People v. Cordell*, 223 Ill. 2d 380, 385 (2006). Here, defendant concedes that only defendant's statutory right is at issue. "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***." 725 ILCS 5/103-5(a) (West 2022). No special demand is required for a defendant who remains in custody (*People v. Cavitt*, 246 Ill. App. 3d 514, 519 (1993)) because "[t]he 120-day speedy-trial period begins to run automatically if a defendant remains in custody pending trial." *People v. Phipps*, 238 Ill. 2d 54, 66 (2010). However, the 120-day speedy-trial period is tolled whenever the defendant causes a period of delay or otherwise agrees to a delay. *People v. Woodrum*, 223 Ill. 2d 286, 299 (2006). If the defendant is not tried within that period, they are entitled to be released from custody and the pending charges are dismissed. *Id.*

¶ 54    In the case at bar, we are dealing with both initial charges and subsequently filed charges. The *Williams* rule addresses subsequently filed charges and states,

> "Where new and additional charges arise from the same facts as did the original charges and the State had knowledge of these facts at the commencement of the prosecution, the time within which trial is to begin on the new and additional charges is subject to the same statutory limitation that is applied to the original charges. Continuances

19

obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained." *People v. Williams*, 94 Ill. App. 3d 241, 248-49 (1981).

¶ 55 However, the *Williams* rule is not always applicable and depends on whether the original and subsequent charges are subject to compulsory joinder. *People v. Woodrum*, 223 Ill. 2d 286, 299 (2006). If compulsory joinder is required, the *Williams* rule applies; however, if compulsory joinder is not required, the *Williams* rule is not applied, and speedy-trial violations may not be applicable. *Id.* (citing *People v. Williams*, 204 Ill. 2d 191, 207 (2003); *People v. Gooden*, 189 Ill. 2d 209, 218 (2000)). "The compulsory joinder statute requires the State to prosecute all known offenses within the jurisdiction of a single court in a single criminal case 'if they are based on the same act.' " *People v. Hunter*, 2013 IL 114100, ¶ 10 (quoting 720 ILCS 5/3-3(b) (West 2022)).

¶ 56 Here, as in *Woodrum*, defendant does not dispute that he agreed to the delays associated with the original charges, and only contends that the delays on the original charges cannot be attributed to him for the later-filed charges. See *Woodrum*, 223 Ill. 2d at 300. The *Woodrum* court found the issue resolved by determining whether the subsequent charges were "new and additional." *Id.* The court noted that the purpose of compulsory joinder rule was to avoid " 'trial by ambush' " that would surprise a defendant and require a " 'Hobson's choice between a trial without adequate preparation and further pretrial detention to prepare for trial.' " *Id.* (quoting *Williams*, 204 Ill. 2d at 207).

¶ 57 Ultimately, the *Woodrum* court found that defendant's charges were identical except for the inclusion of the phrase "for other than a lawful purpose" in the newly filed charges and, therefore, defendant could not have been surprised by charges that were "essentially the same as

20

the original ones." *Id.* at 300-01. Based on those facts, the court found that the subsequent charges were "not 'new and additional' for purposes of defendant's speedy-trial challenge" and the delays attributable to defendant on the original charges were attributable to him on the subsequently filed charges. *Id.* at 301.

¶ 58    Similarly, in *People v. Phipps*, 238 Ill. 2d 54, 57 (2010), the State charged defendant with reckless homicide on April 5, 2004. After a plea agreement was reached on the charge, and nine months after the initial charge was filed, the State moved to vacate defendant's guilty plea and charge defendant with aggravated driving under the influence, noting that the legislature had recently found the reckless homicide statute void. *Id.* at 57-58. The motion was granted, and defendant pled guilty to the aggravated DUI charge and was sentenced on the charge. *Id.* at 58-59. On appeal, defendant argued, *inter alia*, that his counsel was ineffective for failing to object to the new charge on speedy-trial grounds. *Id.* at 60. The appellate court found the charges were subject to compulsory joinder, and the speedy-trial period for reckless homicide also applied to the aggravated DUI charge; however, any delay on the reckless homicide charge could not be attributed to defendant on the aggravated DUI charge because it was "new and additional." *Id.* at 61. Therefore, the appellate court majority found defense counsel was ineffective for failing to seek dismissal of the newly filed charge on speedy-trial counsel and reversed defendant's conviction. *Id.* Justice O'Malley dissented finding the new indictment did not add new and additional charges required to support a speedy-trial claim. *Id.*

¶ 59    On appeal, the Illinois Supreme Court found that the issue of whether the charges were "new and additional" was determined by considering "whether the original charging instrument gave the defendant sufficient notice of the subsequent charges to prepare adequately for trial on those charges." *Id.* at 67. Because the original and subsequent charges alleged the same conduct,

21

it found that the "original indictment provided defendant notice of the material allegations in the subsequent information." *Id.* at 68. Therefore, the *Williams* rule did not apply because the subsequent charge was not "new and additional."

¶ 60   Here, the charges at issue are those found in counts II and III of the information. On review, it is apparent that both charges stem from defendant's actions on September 3, 2022, during which he "repeatedly struck and kicked" the victim resulting in her sustaining a fractured orbital bone. Both counts alleged aggravated domestic battery as violations of section 12-3.2(a)(1) of the Code (720 ILCS 5/12-3.2(a)(1) (West 2022)). Accordingly, if the charges in count II and III are the same, under *Phipps* the subsequent charge would not be "new and additional" for speedy-trial purposes and any delays associated to defendant for the initial charge would be equally attributable to defendant for the subsequent charge.

¶ 61   However, defendant disputes that the charge in count III is the same as that found in count II because count III contained additional language not found in count II. More specifically, defendant argues that the inclusion of language stating that defendant's actions in committing the aggravated battery were "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" created a "new and additional" charge. In support, defendant relies on *People v. Sandlin*, 2021 IL App (5th) 190120-U. Contrary to defendant's claim that these two cases are analogous, the "new, more serious charges" in *Sandlin* involved a new charge of attempted first degree murder while the previous charges were limited to aggravated discharge of a firearm, aggravated domestic battery, and unlawful possession of a weapon by a felon. *Id.* ¶¶ 4, 9. In the case at bar, the additional count was based on the same underlying offense, *i.e.*, aggravated domestic battery, and merely included sentence enhancement language.

22

¶ 62    The addition of a sentence enhancement does not create a new offense. See *People v. Green*, 225 Ill. 2d 612, 619 (2007) (robbery and robbery of a person 60 years or over were not distinct crimes); *People v. Robinson*, 232 Ill. 2d 98, 108 (2008) (involuntary manslaughter and involuntary manslaughter of a family or household member are not distinct crimes); *People v. Van Schoyck*, 232 Ill. 2d 330, 337 (2009) ("[T]here is only one offense of driving under the influence. *** The enhancing factors in subsection (c) do not create a new offense, but rather serve only to enhance the punishment."); *People v. Quiqley*, 183 Ill. 2d 1, 11-12 (1998) (same). Considering the above-stated case law, in conjunction with the facts in this case, we conclude that the compulsory joinder is inapplicable. We find the facts in the case at bar analogous to those seen in *Robinson*, *Green*, and *Van Schoyck*, all of which involved instances in which the underlying offense remained the same and the potential sentence was increased by statutorily allowed sentence enhancements. See *Robinson*, 232 Ill. 2d at 104 (identity of the victim as a family or household member increased the felony); *Green*, 225 Ill. 2d at 619 (identity of the victim based on age would increase the felony); *Van Schoyck*, 232 Ill. 2d at 339 (increased based on the status of defendant's revoked license at the time of the DUI arrest).

¶ 63    We would be remiss to ignore the fact that the ultimate decisions in *Van Schoyck* and *Quigley* found that speedy trial precluded conviction. However, we find the decisions in *Quigley* and *Van Schoyck* distinguishable. In *Quigley*, the State's repeated dismissal and revival of felony and misdemeanor claims in different circuit court cases can only be classified as a blatant attempt to avoid the defendant's written speedy-trial demand regarding the initial charges. Similar actions were also noted in *Van Schoyck*, where it was apparent the State attempted to circumvent the defendant's speedy-trial demand by dismissing the initial charges and then refiling them, at a

23

higher level, after the defendant's initial speedy-trial term was expired. Here, no such action occurred.

¶ 64    Instead, the State added a count, pursuant to subsection 111-3(c-5), to include a written form of the sentence enhancement as required by law. See 725 ILCS 5/111-3(c-5) (West 2022). Subsection 111-3(d) specially allows such amendment "any time prior to trial." *Id.* § 111-3(d). This language is consistent with the holdings in *Robinson* and *Green*. Therefore, we hold that the State's subsequent count merely added a sentence enhancement to the underlying charge of aggravated domestic abuse and such act did not create a new and additional charge subject to compulsory joinder. Accordingly, any continuances attributed to defendant on the initial charges are equally attributable to defendant on the subsequent charge.

¶ 65    Defendant also argues that reliance on the Illinois Supreme Court decisions is unwarranted because the United States Supreme Court case law reaches a contrary conclusion, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013). He argues that the Illinois Supreme Court decisions in *Green* and *Robinson* "reveal[ ] consistent misapplication of Illinois law." We disagree.

¶ 66    First, the decisions in *Apprendi* and *Alleyne* are not relevant to the issue before us. Both decisions hold that the trier of fact in a criminal trial must determine, in addition to whether the State proved the required elements of the crime, any question of fact that could increase defendant's sentence for that crime. *Apprendi*, 530 U.S. at 483-84; *Alleyne*, 570 U.S. at 108. The *Alleyne* decision was issued to reconsider whether *Apprendi* applied to increases in the minimum sentences or just maximum sentences. *Alleyne*, 570 U.S. at 103. *Alleyne* determined that *Apprendi* applied to both minimum and maximum sentences and overruled the court's previous decision in *Harris v. United States*, 536 U.S. 545 (2002), which limited *Apprendi* to maximum sentences. *Id.*

24

at 107. As such, the ultimate holdings in *Apprendi* and *Alleyne* are not relevant in the case at bar where defendant waived his right to a jury trial, elected a bench trial, and the judge addressed all questions of fact—including those related to sentence enhancement—at the trial.

¶ 67　Despite the lack of applicability, defendant parses language from *Apprendi* and *Alleyne* and argues that facts required to prove sentence enhancement are "elements of the crime," citing *Apprendi*, 530 U.S. at 483, and "form a constituent part of a new offense," citing *Alleyne*, 570 U.S. at 114-15. It therefore concludes that the State's inclusion of a sentence enhancement provision in count III was a new and additional charge requiring compulsory joinder and previous Illinois decisions which reached contrary results were incorrectly decided.

¶ 68　We first note that even if we agreed with defendant *in toto*, we are powerless to alter the outcome by ignoring Illinois Supreme Court precedent as defendant conceded that the issue at stake was defendant's statutory right to speedy trial and did not involve any constitutional right. See *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 61 (Where the Illinois Supreme Court " 'has declared the law on any point [related to State law], it alone can overrule and modify its previous opinion, and the lower judicial tribunals are bound by such decision and it is the duty of such lower tribunals to follow such decision in similar cases.' " (quoting *Price v. Philip Morris, Inc.*, 2015 IL 117687, ¶ 38)). Further, well-established and long-held authority confirms that the United States Supreme Court has no authority to review State court judgments resting on adequate and independent state grounds, *i.e.* nonfederal grounds. See *Klinger v. Missouri*, 80 U.S. 257, 263 (1871); *Michigan v. Long*, 463 U.S. 1032, 1043 (1983). Accordingly, this court is bound to follow precedent of the Illinois Supreme Court. *Klinger*, 80 U.S. at 263; *Long*, 463 U.S. and 1043.

¶ 69　Regardless, we do not believe the precedent issued by the Illinois Supreme Court related to compulsory joinder was erroneously determined or should be overturned based on the decisions

25

in either *Apprendi* or *Alleyne*. Neither *Apprendi* nor *Alleyne* focus on or even address the issues of compulsory joinder or speedy trial. The holdings therein relate solely to whether the judge at sentencing, or the trier of fact at the trial, should determine whether the factual elements related to sentence enhancements were met. See *Hill v. Cowan*, 202 Ill. 2d 151, 158 (2002) ("*Apprendi* merely requires the State to prove to the jury beyond a reasonable doubt all facts underlying the sentence imposed on the defendant."). We further note that defendant's argument based on the language of *Apprendi* was previously rejected by the Illinois Supreme Court. See *Robinson*, 232 Ill. 2d at 110-12.

¶ 70    In the case at bar, defendant was arrested on September 3, 2022, and remained in custody until his bench trial was held on March 27, 2023. Numerous continuances were required by defendant and defendant concedes that the trial for the initial counts was timely, based on his previous requests for continuance. As shown above, both the initial count and the subsequently filed count charged defendant with the same offense—aggravated domestic battery pursuant to section 12-3.2(a)(1) of the Code—and were based on the same conduct, *i.e.*, repeatedly striking and kicking Destiny. The only difference was that count III included a sentence enhancement alleging that defendant's acts were accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty." For the reasons stated above, we cannot find that defendant was hindered by the addition of the third charge because defendant's preparation for trial revolved around his claim of self-defense, which was unaffected by the sentence enhancement. However, even if self-defense was not at issue, defendant was clearly aware of the State's elements of proof for both counts II and IIII. Based on defendant's concession that his speedy-trial rights were not violated for the initial counts, we find that defendant's trial for count III would also be timely rendering any motion to dismiss for speedy trial unmeritorious. Accordingly, we find that any

26

motion to dismiss based on count III that could have been filed by defense counsel would not have been meritorious and therefore defendant's claim of ineffective assistance of counsel must fail.

¶ 71                                    C. Sentence Enhancement

¶ 72     Finally, defendant argues that insufficient evidence was presented to sustain the sentence enhancement. Our supreme court defined " 'heinous' behavior as behavior that is hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal." *People v. Kaczmarek*, 207 Ill. 2d 288, 303 (2003) (citing *People v. Nielson*, 187 Ill. 2d 271, 299 (1999); *People v. Lucas*, 132 Ill. 2d 399, 445 (1989); *People v. La Pointe*, 88 Ill. 2d 482, 501 (1981)). The court also defined brutal behavior as that which "is grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded." *Id.* (citing *Nielson*, 187 Ill. 2d at 299; *Lucas*, 132 Ill. 2d at 445; *La Pointe*, 88 Ill. 2d at 501). The court further explained that " 'wanton cruelty' requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense." *Id.* (citing *Nielson*, 187 Ill. 2d at 299; *People v. Pastewski*, 164 Ill. 2d 189, 194 (1995)).

¶ 73     While defendant's actions may not seem as horrifying as others cited by defendant in which the sentence enhancements were upheld, the issue on appeal is not whether this court would have made a finding analogous to that issued by the trier of fact. Typically, when considering sufficiency of the evidence claims, "the reviewing court must view the evidence 'in the light most favorable to the prosecution.' " *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This means the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *Id.* In this case, the question thus becomes " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found' " (emphasis in original) (*id.* at 278 (quoting *Jackson*, 443 U.S. at

27

319)) that the State proved beyond a reasonable doubt that defendant's actions were accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

¶ 74 Here, the State's evidence included testimony from Destiny's treating physician revealing that Destiny was beaten so badly that emergency surgery was required, prior to her first life-flighted ride to Springfield, Illinois, just to keep her alive. The physician also noted that Destiny's "face was basically swollen shut" and she had "massive facial trauma."

¶ 75 The evidence further revealed, based on defendant's police interview, that the attack was unprovoked. Destiny was in the shower when defendant looked at her phone. By his own admission during the interview, defendant was filled with "rage" and "jealousy." He did not attempt to talk to Destiny prior to the attack; he just beat her. Additionally, he admitted that he hit her harder than he had ever hit her before, stating,

> "With all the anger inside of me I hit her. And I hit her multiple times. *** I didn't know what to do. My inner self was telling me to stop but I—I couldn't face the fact that she had cheated on me. *** I beat her. I realized that I had hit her with my actual strength, with all my strength, not with all of it, but with the strength that I had never before hit her. And I knew, I knew, something hit me. She couldn't … She couldn't move man. She normally shouts and screams and takes it y'know and gets upset. She couldn't move."

Defendant's police interview further revealed that he repeatedly punched and kicked Destiny until she was unconscious and was aware of his inability to control his temper. Defendant agreed that his anger got the better of him and stated, "I know I'm a person that has a high temperament and it's hard to control." When asked if he got angry easily, he stated, "It's not even about getting angry easy, but when I get angry, I just lose it and blackout."

28

¶ 76    The State's evidence also revealed a lack of remorse following the cessation of Destiny's beating. Defendant told police that he felt two things after he hit Destiny—one of which was "relief." Defendant also told police that after he beat Destiny, he put her in the shower. When Destiny told him she could not open her eyes, defendant responded by telling her he did not care. By his own admission, defendant just wanted Destiny to rinse off the blood so she could leave. At no time did defendant call 911. Instead, he called Destiny's family and told them to pick her up but not call the police. Finally, when Destiny's mother and grandmother arrived to pick up Destiny, and Destiny's mother asked what defendant did to her daughter, defendant laughed at her and spit on her. He later flipped them off as they drove from his residence.

¶ 77    While there was no evidence of torture, torture is not required to find brutal or heinous behavior. *People v. Nitz*, 219 Ill. 2d 400, 418 (2006). We thus cannot find the evidence insufficient to support a finding of brutal or heinous behavior indicative of wanton cruelty. Defendant's behavior was brutal, devoid of mercy or compassion, and clearly sought to inflict pain and suffering on Destiny. Accordingly, we find the State presented sufficient evidence to support sentence enhancement.

¶ 78                                III. CONCLUSION

¶ 79    For the foregoing reasons, we affirm the trial court's judgment and sentencing.


¶ 80    Affirmed.